# EXHIBIT 2

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

ARTICLE 1.     DEFINITIONS ............................................................... 5
ARTICLE 2.     DELIVERY AND TECHNICAL ACCEPTANCE ................................. 11
ARTICLE 3.     CONDITIONS PRECEDENT ............................................. 12
ARTICLE 4.     TERM ......................................................... 14
ARTICLE 5.     TIME AND PLACE OF PAYMENTS. ...................................... 14
5.01     Reserved ............................................................ 14
5.02     Supplemental Payments................................................ 14
5.03     Costs................................................................ 14
5.04     Reserved ............................................................ 14
5.05     Place and Time of Payment............................................ 14
ARTICLE 6.     DISCLAIMER AND WAIVERS; OPERATOR'S
               REPRESENATIONS AND WARRANTIES ...................................... 15
6.01     "As Is, Where Is". .................................................. 15
6.02     Waiver............................................................... 15
6.03     Conclusive Proof. ................................................... 15
6.04     No Boeing Liability. ................................................ 16
6.05     Operator's Representations and Warranties. .......................... 16
ARTICLE 7.     POSSESSION, OPERATIONS AND MAINTENANCE ............................ 19
7.01     Possession and Use. ................................................. 19
7.02     Assignment by Operator .............................................. 19
7.03     Lawful Operations.................................................... 20
7.04     Insured Operations. ................................................. 20
7.05     Maintenance. ........................................................ 20
7.06     Insignia. ........................................................... 21
7.07     Records. ............................................................ 21
ARTICLE 8.     INSPECTION AND REPORTS............................................. 22
8.01     Inspection. ......................................................... 22
8.02     Reports. ............................................................ 22
ARTICLE 9.     OPERATOR'S ........................................................ 23
9.01     Maintenance of Corporate Existence. ................................. 23
9.02     Notice of Litigation, Etc. .......................................... 23
9.03     Payment of Taxes..................................................... 23
9.04     Consolidation, Merger or Sale. ...................................... 24
9.05     No Distributions..................................................... 24
9.06     Landing Fees and Charges............................................. 24
9.07     Certificated Air Carrier. ........................................... 24
9.08     Maintenance Provider. ............................................... 24
ARTICLE 10.    REPLACEMENT OF PARTS; ALTERATIONS, MODIFICATIONS
               AND ADDITIONS ..................................................... 26
10.01    Replacement of Parts. ............................................... 26
10.02    Title to Replaced Parts. ............................................ 26
10.03    Alterations, Modifications and Additions. ........................... 26
10.04    Title to Parts. ..................................................... 26
ARTICLE 11     GENERAL TAX INDEMNITY ............................................. 27

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

| | | |
|---|---|---|
| 11.01 | (a) Indemnity. | 27 |
| | (b)   Withholding Taxes. | 27 |
| | (c) Limitation on Indemnity. | 28 |
| 11.02 | After-Tax Nature of Indemnity. | 29 |
| 11.03 | Application of Payments During Existence of a Default or Event of Default. | 29 |
| 11.04 | Survival of Indemnities.  Notwithstanding | 29 |
| ARTICLE 12. | DAMAGE, DESTRUCTION, REQUISITION OR CONDEMNATION. | 29 |
| 12.01 | Event of Loss with Respect to an Airframe or an Airframe and the Engines Installed Thereon | 29 |
| 12.02 | Event of Loss with Respect to an Engine. | 30 |
| 12.03 | Event of Loss With Respect to an LCL or LCF Tail Stand. | 31 |
| 12.04 | Application of Payments from Government Bodies for Requisition of Title. | 31 |
| 12.05 | Requisition of Airframe for Use by Government. | 31 |
| 12.06 | Requisition of an Engine for Use by Government. | 32 |
| 12.07 | Application of Payments During Existence of Default or Event of Default. | 32 |
| 12.08 | Damage Notification. | 32 |
| ARTICLE 13. | INSURANCE | 32 |
| 13.01 | Aviation And General Third Party Legal Liability Insurance. | 32 |
| 13.02 | Aircraft Hull and Physical Damage Insurance. | 33 |
| 13.03 | Default. | 35 |
| 13.04 | Certificates. | 35 |
| 13.05 | Premiums. | 35 |
| 13.06 | Claims. | 36 |
| 13.07 | Reinsurance. | 36 |
| 13.08 | Lloyd's Endorsements. | 37 |
| 13.09 | Self-Insurance. | 37 |
| ARTICLE 14. | GENERAL INDEMNIFICATION | 37 |
| ARTICLE 15. | LIENS | 38 |
| ARTICLE 16. | REGISTRATION, RECORDATION AND FURTHER ASSURANCES | 38 |
| 16.01 | Registration; Recordation. | 39 |
| 16.02 | Further Assurances. | 39 |
| ARTICLE 17. | RETURN OF AIRCRAFT AND AIRCRAFT DOCUMENTATION | 39 |
| 17.01 | Aircraft Return Conditions. | 39 |
| 17.02 | Pre-Return Report and Inspections. | 39 |
| 17.03 | Return of other Items of Equipment. | 40 |
| 17.04 through 17.07 | Reserved. | 40 |
| 17.08 | Storage. | 40 |
| 17.09 | Maintenance at Boeing's Request. | 40 |
| 17.10 | Deregistration and Export. | 41 |
| 17.11 | Aid in Disposition. | 41 |
| 17.12 | Assistance with Assignments. | 41 |
| ARTICLE 18. | EVENTS OF DEFAULT | 41 |
| ARTICLE 19. | REMEDIES | 44 |

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

**ARTICLE 20.   TERMINATION FOR CONVENIENCE**.................................................45
**ARTICLE 21.   MAINTENANCE REIMBURSEMENTS** ..............................................45
21.01   Maintenance Reimbursements.........................................................................45
21.02   Maintenance Reimbursement Payment and Notice Procedures. ..................46
21.03   Boeing Contributions for Maintenance. ...........................................................46
21.03.A Request for Early Maintenance.........................................................................47
21.04   Notional Maintenance Reimbursements. .........................................................47
21.05   Responsibilities of Operator, Boeing. ..............................................................48
21.06   Airworthiness Directives ..................................................................................48
**ARTICLE 22.   RESERVED**....................................................................................48
**ARTICLE 23.   CHARACTERIZATION OF THE CONTRACT** ....................................48
23.01   Intent of Parties. ..............................................................................................48
23.02   Tax Assumptions. .............................................................................................48
23.03   Tax Representations. ........................................................................................48
23.04   Tax Indemnity. ..................................................................................................48
23.05   Definitions. ........................................................................................................48
23.06   Operator Reporting Requirements. ..................................................................49
**ARTICLE 24.   MISCELLANEOUS** ..........................................................................49
24.01   Construction. .....................................................................................................49
24.02   Notices...............................................................................................................49
24.03   RESERVED .......................................................................................................49
24.04   Counterparts......................................................................................................49
24.05   RESERVED .......................................................................................................49
24.06   RESERVED .......................................................................................................49
24.07   RESERVED .......................................................................................................49
24.08   Survival..............................................................................................................49
24.09   RESERVED .......................................................................................................50
24.10   Currency. ...........................................................................................................50
24.11   Commercial Acts. ..............................................................................................50
24.12   RESERVED .......................................................................................................50
24.13   GOVERNING LAW.............................................................................................51
24.14   WAIVER OF JURY TRIAL. ................................................................................51
24.15   Submission to Jurisdiction.................................................................................51
24.16   RESERVED .......................................................................................................51
24.17   RESERVED .......................................................................................................51
24.18   Entire Agreement. .............................................................................................51
24.19   Use of English Language. .................................................................................51
ATTACHMENT 1A (Delivery and Technical Acceptance) ..............................................1
Annex I to Delivery and Technical Acceptance (Aircraft Doc)...........................................4
Annex II to Delivery and Technical Acceptance (Loose Load List) ..................................1
Annex III to Delivery and Technical Acceptance (Other Aircraft Info)..............................1
ATTACHMENT 1B (LCL/Tail Stand Delivery Receipt) ...................................................1
ATTACHMENT 1C (Monthly Report).............................................................................1
ATTACHMENT 1D (Form of Eurocontrol Letter) ...........................................................1

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

ATTACHMENT 1E (RESERVED) ........................................................................... 1
ATTACHMENT 1F (Form of Re-Delivery Certificate) ..................................................... 1
  ANNEX I TO RE-DELIVERY CERTIFICATE (Aircraft Doc).............................................. 1
ATTACHMENT 1G (Form of Re-Delivery Report)........................................................... 1
SCHEDULE 1 (Required Approvals)........................................................................... 1
SCHEDULE 2 (Aircraft Return Conditions) .................................................................. 1

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

This exhibit is part of a Contract made by and between **The Boeing Company**, a Delaware corporation, acting by and through its division, Shared Services Group (hereinafter referred to as "Boeing") and **Evergreen International Airlines, Inc.**, an Oregon Corporation (hereinafter referred to as "Operator"). The Parties agree that the Contract consists of all of the Contract documents identified in Exhibit G – Terms and Conditions Relating to Large Cargo Freighter Operator Service ("Exhibit G") which documents are to be taken as a whole in their entirety and that no exhibit, attachment or other subpart of the Contract is to be considered a separate, stand alone agreement. In addition, the Parties agree that in the event that Exhibit G should no longer be effective, Exhibit D shall automatically terminate.

## ARTICLE 1.   DEFINITIONS

Capitalized terms used herein and not defined shall have the meeting set forth in ("Exhibit G"). Unless the context otherwise requires, the following terms shall have the following meanings for all purposes of the Contract and shall be equally applicable to both the singular and the plural forms of the terms herein defined:

"Accounting Principles" means GAAP.

"Additional Insured" is defined in Section 13.01(A).

"Aircraft" or "LCF" means, in addition to the definition of "Large Cargo Freighter" and "LCF" set forth in Exhibit G to the Contract,  the modified Boeing–owned 747-400 Airframes furnished to Operator hereunder together with the Engines installed on the Airframes or any Engine as defined herein, all as more particularly described and identified in the Delivery and Technical Acceptance. Where the context may permit, "Aircraft" or "LCF" shall also include the Aircraft Documentation. Any reference to Aircraft or LCF shall mean a reference to one or more thereof as the context may require.

"Aircraft Documentation" means the documents listed in Schedule 1 to the Delivery and Technical Acceptance and all other logs, manuals and data, and inspection, modification, service, maintenance, overhaul and other records required to be maintained under the LCF-LCL Terms or applicable Aviation Authority and FAA rules and regulations, in each case, with respect to the Aircraft.

"Airframe" means:  (a) the used Boeing Model 747 aircraft described in each Delivery and  Technical Acceptance (except the Engines and engines from time to time installed on such Airframes), having the manufacturer's serial number and the FAA registration number as set forth in the Delivery and Technical Acceptance, and (b) any and all related Parts.

"Airworthiness Directive" means any requirement for the inspection, repair or modification of the Aircraft or any portion thereof as issued by any Aviation Authority or by the FAA under the provisions of the Federal Aviation Regulations.

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

"Average Refurbishment Interval" means the total Flight Hours or Cycles (whichever is more limiting) in the Engine Manufacturer's then current same model (as the Engine) world wide fleet average interval for Refurbishment.

"Aviation Authority" means, where applicable, any or all of the United States Department of Transportation, the FAA and/or the Administrator of the FAA, the JAA, or any Person, Government Body, bureau, commission or agency succeeding to the functions of any of the foregoing, in each case having at any time jurisdiction over the Aircraft or Operator's operations.

"Balance Sheet" is defined in Section 6.05(h).

"Block Hour Rate" means the rate, as set forth in Exhibit A – Pricing Exhibit, paid by Boeing to Operator for the Services provided by Operator pursuant to the Contract. The Block Hour Rate includes all the costs associated with Operator's performance of the Contract except for Pass-Through Charges.

"Boeing's Liens" means Liens on or relating to or affecting any Item of Equipment arising as a result of claims against Boeing (including, without limitation, claims for Taxes) not related to this Contract or the other Operative Documents and for which Operator is not obligated to indemnify Boeing hereunder.

"Certificated Air Carrier" means an air carrier certificated by the FAA or otherwise qualified for commercial air transportation of passengers/cargo under the provisions of the Federal Aviation Regulations Part 121.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract", "this Contract", "this Agreement", "herein", "hereunder", "hereby" and other like words mean the "Contract" as defined in Exhibit G, as it may be amended, modified or supplemented pursuant to the applicable provisions hereof, including, without limitation, supplementation hereof by the Delivery and Technical Acceptances, and LCL/Tail Stand Delivery Receipts entered into pursuant to the applicable provisions hereof.

"Cycle" means one take-off and landing of the Airframe or any airframe on which an Engine, Landing Gear or any other Part is installed.

"Debt" of any Person means, on any date, all indebtedness of such Person as of such date, and shall include the following: (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person to pay the deferred purchase price of property or services; (d) all obligations of such Person under leases which are not "true leases" for United States federal income tax purposes; (e) all indebtedness secured by a Lien on any asset of such Person, whether or not such Person has assumed or is otherwise liable for such indebtedness; (f) all Debt of others guaranteed in any manner, directly or indirectly, by such Person (or in effect guaranteed indirectly by such Person through an agreement intended to have the effect of enabling an obligor other than such Person to satisfy Debt or to assure the holder of Debt of such obligor

LCF Operator Service

against loss, whether through an obligation of such Person to purchase property or services or to maintain such obligor's financial condition or otherwise) and (g) all reimbursement obligations of such Person in respect of letters of credit, foreign currency sale agreements and bankers' acceptances.

"Default" means any event or condition which with the lapse of time or the giving of notice, or both, would constitute an Event of Default.

"Delivery and Technical Acceptance" means the Delivery and Technical Acceptance substantially in the form of Attachment A hereto, entered into between Boeing and Operator for the purpose of using the Items of Equipment under and pursuant to the terms of this Contract.

"Delivery Date" means the date of the Delivery and Technical Acceptance, which date shall be the date the Aircraft is delivered by Boeing and accepted by Operator, pursuant to the provisions of Article 2 hereof.

"Delivery Location" means, the Component Airport Locations with respect to the three (3) LCLs and three (3) of the LCF Tail Stands, the Pinal Air Park, Marana, Arizona with respect to the fourth (4th) LCF Tail Stand and King County Municipal Airport, Seattle, Washington with respect to the Aircraft, or such other location as agreed upon by Boeing and the Operator.

"Dollars", "$" and "US$" means United States Dollars, being the lawful currency of the United States of America.

"Engine" means:  (a) any of the engines listed by manufacturer's serial number in a Delivery and  Technical Acceptance and installed on the Airframe covered by the Delivery and Technical Acceptance whether or not from time to time installed on the Airframe or installed on any other airframe or any other aircraft; (b) any engine which may from time to time be substituted, or be a replacement or addition pursuant to Section 12.02 or Schedule 2 hereof, for any such Engine; and (c) except as otherwise provided in Sections 10.02 and 10.04 hereof, any and all Parts installed or required to be installed in the Engines.

"Engine LLP's" is defined in Section 21.01(e).

"Engine Manufacturer" means Pratt & Whitney.

"Eurocontrol" means the European Organization for the Safety of Air Navigation established by the Convention relating to the Co-operation for the Safety of Air Navigation (Eurocontrol) signed on 13 December 1960 as amended by the Protocol thereto signed on 12 February 1981.

"Eurocontrol Letter" means a letter addressed to Eurocontrol signed by Operator substantially in the form of Attachment D hereto.

"Event of Default" is defined in Article 18 hereof.

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

"Event of Loss" with respect to any Item of Equipment means any of the following events with respect to such Item:  (a) loss of such Item of Equipment or the use thereof due to disappearance for a period in excess of thirty (30) days (or such shorter period ending on the date on which an insurance settlement has been reached on the basis of a total loss); (b) theft, destruction, damage beyond repair or rendering of such Item permanently unfit for normal use for any reason whatsoever; (c) any damage to such Item which results in an insurance settlement with respect to such Item on the basis of an actual or constructive total loss; (d) the condemnation, confiscation or seizure of, or requisition of title to, or requisition of use (for a period in excess of thirty (30) days) of, such Item by any Government Body; or (e) as a result of any rule, regulation, order or other action by any Aviation Authority, or other Government Body having jurisdiction, the use of such Item in the normal course of air transportation of persons or property shall have been prohibited for a period of not less than six (6) months.  An Event of Loss with respect to an Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to an Airframe.

"FAA" means the United States Federal Aviation Administration and any Person, Government Body, bureau, commission or agency or agencies succeeding to the functions thereof.

"Federal Aviation Regulations" means the regulations contained in Title 14 of the United States Code of Federal Regulations.

"Flight Hour" means: (a) with respect to an Airframe, each hour or part thereof which elapses from the time the wheels of the Airframe leave the ground on take-off and the time when the wheels of the Airframe touch the ground on landing, and (b) with respect to an Engine, Landing Gear or other Part, each hour or part thereof which elapses from the time the wheels of the airframe, whether or not the Airframe furnished hereunder, on which such Engine, Landing Gear or other Part is installed, leave the ground on takeoff and the time when the wheels of such airframe touch the ground on landing.

"GAAP" means generally accepted accounting principles as set forth in the statements of financial accounting standards issued by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants, as such principles may at any time or from time to time be varied by any applicable financial accounting rules or regulations issued by the United States Securities and Exchange Commission.

"Geneva Convention" means the Convention for the International Recognition of Rights in Aircraft, signed (ad referendum) at Geneva, Switzerland, on June 19, 1948.

"Government Body" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, or any securities exchange.

"Heavy Check" means the scheduled structural maintenance checks required by the Maintenance Program (e.g. D/SI, SC4, SC8, SC12 or similar check).

LCF Operator Service

"Incentive Rate" means a per annum interest rate equal to the Prime Rate plus three percent (3%), or the maximum rate permitted by applicable law, whichever is less, calculated on the basis of a year of three hundred and sixty (360) days and actual days elapsed.

"Indemnified Parties" and "Indemnified Party" are defined in Section 14.01.

"Item(s) of Equipment" or "Item(s)" means all or any of the Aircraft, the Airframes, the Engines, the Landing Gear, the LCLs, the LCF Tails Stands, each Part and any other Boeing-supplied equipment.

"JAA" means the European Joint Aviation Authorities including without limitation the European Aviation Safety Agency, and any Person, Government Body, bureau, commission, agency or agencies succeeding to the functions thereof.

"Landing Gear" means any of the Landing Gear installed on an Airframe on the Delivery Date (or any landing gear as may be substituted therefor after the Delivery Date in accordance with the requirements of the LCF-LCL Terms).

"Law(s)" means any and all (a) constitutions, laws, statutes, ordinances, decrees, regulations, principles of common law, or orders or directives of any Government Body, (b) multinational or international treaties, conventions or accords to which any Government Body is signatory or party, and (c) judicial or administrative interpretations or applications of any of the foregoing.

"LCF-LCL Terms" means the attachment to the Contract Exhibit D -Terms and Conditions Relating to Use of Large Cargo Freighters, Large Cargo Loaders, Large Cargo Freighter Tail Stands and Other Items of Equipment and all attachments thereto.

"LCF Tail Stand" means, in addition to the definition of "Large Cargo Freighter Tail Stand" and "LCF Tail Stands" set forth in Exhibit G to the Contract, the LCL Tail Stands furnished to Operator hereunder, as more particularly described in the LCL/Tail Stand Delivery Receipt attached hereto as Attachment B.

"LCL" means, in addition to the definition of "Large Cargo Loader" and "LCL" set forth in Exhibit G to the Contract, the Large Cargo Loaders furnished to Operator hereunder, as more particularly described in the LCL/Tail Stand Delivery Receipt.  Where the context may permit, LCL shall also include all technical documentation furnished with the LCL.

"Lien" means any mortgage, pledge, hypothecation, lien, charge, encumbrance, lease, right of detention, exercise of rights, security interest or claim.

"Life Limited Parts" or "LLP's" means Parts that have a specified maximum life or time limit after which such Parts must be scrapped or discarded and can no longer be refurbished and reinstalled on or in an Airframe, any Engine or any Part.

"Maintenance Program" means Operator's FAA approved overhaul and maintenance program, including all corrosion control provisions, applicable to the Aircraft, which program shall comply in all material respects with the then latest revision of the

LCF Operator Service

<div align="center">SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT<br>
EXHIBIT D<br>
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE<br>
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT</div>

Manufacturer's maintenance planning document, and any other maintenance program applicable to other Items of Equipment, including but not limited to the LCL and LCF Tail Stands.

"Maintenance Provider" means Evergreen Air Center, Inc.

"Manual(s)" means those manuals and specifications, including any subsequent amendments or supplements thereto which may be issued from time to time, generated by any manufacturer of an Item of Equipment, including the Manufacturer and Engine Manufacturer, which prescribe maintenance and/or operational requirements for the Aircraft or the applicable Item.

"Manufacturer" means The Boeing Company and any other original equipment manufacturer.

"Operative Documents" means, collectively, the Contract, the Delivery and Technical Acceptance, the LCF-LCL Terms, the LCL/Tail Stand Delivery Receipt and the Eurocontrol Letter attached to this Exhibit D.

"Operator Liabilities" means Debt of Operator.

"Overhaul" means the complete disassembly, inspection, cleaning, repair, Refurbishment, reassembly and testing of an Item in accordance with the applicable Manuals and the Maintenance Program.

"Parts" means any and all appliances, parts, systems, components, assemblies, rotables, LLP's, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature (other than engines), which (a) are from time to time incorporated or installed in or attached to an Airframe, any Engine, any LCL, or any LCF Tail Stand or (b) having been so installed or attached, are later removed therefrom, so long as title thereto remains vested in Boeing in accordance with Sections 10.02 and 10.04 hereof after such removal from the Airframe, Engine, LCL or LCF Tail Stand. "Part" means any one of the Parts.

"Pass-Through Charges" means those charges as identified in Exhibit A – Pricing Exhibit.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or Government Body or any other entity.

"Prime Rate" means the interest rate designated by J.P. Morgan Chase Bank, National Association, or any successor thereto, from time to time at its principal office in New York City as its prime or base lending rate; with each change in such rate to take effect immediately under the LCF-LCL Terms (calculated on the basis of a year of three hundred sixty (360) days and actual days elapsed).

"Refurbishment" of an Engine means the heavy maintenance for such Engine performed by an FAA approved maintenance provider during a shop visit that requires the

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

teardown/ disassembly, repair and refurbishment of the high pressure compressor (HPC), high pressure turbine (HPT) and Combustor modules of such Engine, and the inspection, teardown/disassembly and repair and refurbishment as and if required (as dictated by inspection or engine trend monitoring and the Engine Manufacturer's shop manual limits) of each of the other modules of such Engine, resulting in full performance restoration of such Engine in accordance with the Engine Manufacturer's shop manual limits and the Engine Manufacturer's then current Workscope Planning Guide and as required by the Operator's Maintenance Program.

"Required Approval" means all necessary or advisable authorizations, consents, approvals, waivers, exemptions, variances, franchises, permissions, permits and licenses of, and filings, registrations, recordings and declarations with, all governmental authorities as to the provisions of this Contract and the other Operative Documents and the consummation of the transaction contemplated hereby and thereby by the Delivery Date including, without limitation, any requirements set forth in Schedule 1.

"State of Registration" means the United States of America.

"Stipulated Loss Value" means the amount equal to the Stipulated Loss Value as set forth in the Delivery and Technical Acceptance.

"Supplemental Payments" means all amounts, liabilities and obligations which Operator assumes or agrees to pay under the LCF-LCL Terms, the other Operative Documents or related documents to Boeing or others, including, without limitation, (a) all Stipulated Loss Value payments; (b) all amounts required to be paid by Operator under the agreements, covenants and indemnities contained in the LCF-LCL Terms and the other Operative Documents; (c) interest at the Incentive Rate in accordance with Section 5.02 (Supplemental Payments); and (d) any and all liabilities, obligations, losses, damages, penalties, taxes, claims, actions, suits, costs, expenses or disbursements (including without limitation legal fees and expenses) of any kind and nature whatsoever which may be imposed upon or incurred by Boeing by reason of the failure of Operator to duly perform its obligations under the LCF-LCL Terms or the other Operative Documents.

"Taxes" is defined in Section 11.01(a) (Indemnity) hereof.

"Technical Report" is defined in Section 8.02(iv) hereof.

"Term" means the term for which the Aircraft, LCLs, LCF Tail Stands and any other Item of Equipment are furnished hereunder pursuant to Article 4 (Term) hereof.

"Time Controlled Components" means Parts described in the Maintenance Program that have specified intervals at which such Parts must be either bench-checked, refurbished or replaced, as applicable.

## ARTICLE 2.   DELIVERY AND TECHNICAL ACCEPTANCE

2.01   Boeing hereby agrees (subject to satisfaction of the conditions set forth herein) to furnish to Operator hereunder, and Operator hereby agrees to accept   from Boeing

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

hereunder, the Aircraft, LCLs and LCF Tail Stands as further evidenced by the execution by Boeing and Operator of Delivery and Technical Acceptances and LCL/Tail Stand Delivery Receipts. The Aircraft, together with such of the Aircraft's records and data as Boeing shall have in its possession or be located on the Aircraft, shall be delivered to Operator at the Delivery Location on the Delivery Date, and Operator shall accept delivery of the Aircraft hereunder upon tender of delivery of the Aircraft by Boeing to Operator. The Delivery Date for the Aircraft, LCLs, LCF Tail Stands and other Items of Equipment shall be as agreed upon by the Parties.

2.02    At all times during the Term, full legal title to each Item of Equipment shall remain vested in Boeing to the exclusion of Operator, notwithstanding the delivery of such Item to, and the possession and use thereof by, Operator. Operator acknowledges and agrees that each Item of Equipment shall be used exclusively in connection with the Contract for the transportation of Boeing cargo and related support services.

2.03    Operator hereby agrees that acceptance of delivery of the Aircraft and each other Item by Operator's authorized representative or representatives, as evidenced by Operator's execution of a Delivery and Technical Acceptance and the LCL/Tail Stand Delivery Receipts, shall, without further act, irrevocably constitute acceptance by Operator of the relevant Item for all purposes of this Contract.

## ARTICLE 3.   CONDITIONS PRECEDENT

3.01    Boeing's obligation to furnish the Items of Equipment to Operator hereunder shall be subject to satisfaction, or waiver in writing, on or before the Delivery Date of each and all of the following conditions precedent:

(a)    Boeing shall have received the following:

(i) the Contract, duly authorized and executed by Operator;

(ii) the Delivery and Technical Acceptance and the LCL/Tail Stand Delivery Receipt, duly authorized and executed by Operator as of the Delivery Date;

(iii) UCC statement and such other filings and perfection documents as Boeing deems reasonably necessary to protect Boeing's interest in the LCF in the appropriate jurisdiction(s);

(iv) an independent insurance broker's report, in form and substance satisfactory to Boeing, describing all insurance and reinsurance then carried and maintained with respect to the Aircraft and each other Item and the expiration date thereof, together with certificates of insurance and reinsurance in accordance with Article 13 (Insurance) hereof, including a written confirmation from such broker in a form reasonably satisfactory to Boeing that such insurance and reinsurance complies with the terms of Article 13 (Insurance) hereof;

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

(v) a favorable opinion of Washington counsel for Operator, dated the Delivery Date, in form and substance satisfactory to Boeing covering such matters as Boeing may reasonably request in respect of the transactions contemplated hereby and by the other Operative Documents;

(vi) a favorable opinion of FAA counsel acceptable to Boeing, dated the Delivery Date, opining that the Aircraft (including the Engines) is free and clear of any mortgage, lease, pledge, lien, charge or encumbrance of record, and that the Aircraft is owned as a matter of record solely by Boeing.

(vii) a true and complete copy of the Maintenance Program;

(viii) the Eurocontrol Letter, duly authorized and executed by Operator;



REDACTED

(x) such other documents as Boeing may reasonably request, in form and substance satisfactory to Boeing.

(b)     On the Delivery Date, Operator shall have paid all fees, Taxes (including stamp taxes) and other amounts being due and payable on or before the Delivery Date pursuant hereto

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

(c)     On the Delivery Date the following statements shall be true and Boeing shall have received a certificate satisfactory to Boeing signed by a duly authorized officer of Operator, dated the Delivery Date, stating that:

(i)     the representations and warranties contained in Section 6.05 (Operator's Representations and Warranties) hereof and in Exhibit G are true and accurate on and as of the Delivery Date as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date in which case such representation or warranty shall be true and correct as of such earlier date); and

(ii)     neither Operator nor any of its affiliates shall be in default of its obligations under any agreement with Boeing or any affiliate of Boeing in any material respect.

**ARTICLE 4.   TERM.**

The term for which Operator shall be permitted to use the Items of Equipment (the "Term") shall commence on the Delivery Date and shall continue for a period as set forth in Article 3 of Exhibit G of the Contract ending on the Contract Termination Date, unless earlier terminated in accordance with Section 19.01 of the LCF-LCL Terms or with Exhibit G.

**ARTICLE 5.    TIME AND PLACE OF PAYMENTS.**

5.01    Reserved

5.02    Supplemental Payments.   Operator also agrees to pay Boeing, or at Boeing's direction whomsoever shall be entitled thereto, any and all Supplemental Payments promptly as the same shall become due and owing.   To the extent not specified in the LCF-LCL Terms or any related notice or invoice, Supplemental Payments shall be due and owing upon demand.   Operator will also pay to Boeing, as Supplemental Payments, interest at the Incentive Rate on any payment of Supplemental Payments not paid when due hereunder for the period until the same shall be paid.

5.03    Costs.   Operator agrees that it will pay or cause to be paid all costs, charges, fees and expenses associated with the registration, import, export, re-registration, use, operation, possession, control, maintenance and insurance of the Aircraft, and each Item of Equipment.

5.04    Reserved

5.05    Place and Time of Payment.   All amounts payable to Boeing under the LCF-LCL Terms shall be paid by wire transfer of immediately available funds consisting of lawful currency of the United States of America, in such manner that Boeing receives the full amount of such payments, without deduction for any bank transaction or wire transfer fees, no later than 11:00 a.m. (New York City time) on the due dates at the account specified in the Delivery and Technical Acceptance or such other account as Boeing

　
LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

may designate in writing to Operator. Operator agrees to instruct the remitting bank with respect to any such payments that all forms of payment instructions to any beneficiary bank, such as SWIFT or SWIFT MT100, shall prohibit the deduction of any bank transaction or wire transfer fee from any such payments.

## ARTICLE 6.   DISCLAIMER AND WAIVERS; OPERATOR'S REPRESENATIONS AND WARRANTIES

6.01   "As Is, Where Is".   OPERATOR UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT IT ACCEPTS THE ITEMS OF EQUIPMENT HEREUNDER "AS-IS", "WHERE-IS" AND THAT NEITHER BOEING NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, SUCCESSORS, ASSIGNS OR SUBCONTRACTORS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, AGENTS, REPRESENTATIVES, SHAREHOLDERS OR EMPLOYEES HAVE MADE OR WILL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (a) THE TITLE (WHETHER BY WAY OF INFRINGEMENT, INTERFERENCE OR OTHERWISE AND INCLUDING WITHOUT LIMITATION THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY RIGHTS), (b) AIRWORTHINESS, CONDITION, VALUE, DESIGN, CAPACITY, AGE, QUALITY, DURABILITY, PERFORMANCE, OPERATION, MANUFACTURE, MERCHANTABILITY OR FITNESS FOR USE OR PARTICULAR PURPOSE OF ANY ITEM OF EQUIPMENT, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF ANY ITEM OF EQUIPMENT OR AS TO THE CONFORMITY OF ANY ITEM OF EQUIPMENT TO THE DESCRIPTION CONTAINED HEREIN, IN THE DELIVERY AND TECHNICAL ACCEPTANCE OR ELSEWHERE, (c) THE ADEQUACY OF THE AIRCRAFT DOCUMENTATION OR ANY OTHER DOCUMENTS AND ENGINE RECORDS DELIVERED TOGETHER WITH ANY ITEM OF EQUIPMENT, (d) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE OR (e) ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY ITEM OF EQUIPMENT, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND EXTINGUISHED.

6.02   Waiver  Operator hereby waives as between itself and Boeing and agrees not to seek to establish or enforce any rights and remedies, express or implied (whether statutory or otherwise) against Boeing or any Item relating to any of the matters set forth in Section 6.01 hereof.

6.03   Conclusive Proof.   DELIVERY OF THE DELIVERY AND TECHNICAL ACCEPTNCE BY OPERATOR TO BOEING SHALL BE CONCLUSIVE PROOF AS BETWEEN BOEING AND OPERATOR THAT OPERATOR'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED THE AIRCRAFT, ENGINES,AND EACH OTHER ITEM OF EQUIPMENT AND EACH PART THEREOF AND THAT THE AIRCRAFT, ENGINES, AND EACH OTHER ITEM OF EQUIPMENT AND EACH PART THEREOF IS AIRWORTHY (IF REQUIRED TO BE AIRWORTHY) AND IN GOOD WORKING ORDER AND REPAIR, WITHOUT DEFECT (WHETHER OR NOT DISCOVERABLE AT THE DELIVERY DATE) AND IN EVERY WAY SATISFACTORY TO OPERATOR.

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

6.04   No Boeing Liability.  In no event shall Boeing or any other Indemnified Party bear any liability, responsibility or expense whatsoever to Operator or any other Person, whether in contract or tort and however arising, for any cost, loss or damage (consequential or otherwise), loss of revenue, loss or suspension of certification of the Aircraft, or grounding of the Aircraft or any other claims whatsoever arising from (a) the condition of any Item of Equipment; (b) any maintenance, repair or replacement of any Item of Equipment; (c) any alteration, modification or addition to any Item of Equipment, including any alteration, modification or addition pursuant to Article 10 (Replacement of Parts) hereof, or; (d) any inspection performed by Boeing, or lack of inspection by Boeing, in accordance with any inspection rights granted to Boeing under the Contract. Boeing shall not have any duty to determine whether any Item of Equipment is required to be overhauled, refurbished or maintained, or to observe or inspect the overhaul, refurbishment or maintenance of any Item of Equipment, and Boeing shall not incur any liability or obligation by reason of the failure of any Item of Equipment to be properly overhauled or maintained or by reason of Boeing's election to observe or inspect or not to observe or inspect any overhaul, refurbishment or maintenance of any Item of Equipment.

6.05   Operator's Representations and Warranties.   In addition to the Operator's representations, warranties and covenants set forth in Exhibit G of the Contract, Operator represents, warrants and covenants as follows:

(a)   Organization, Etc.  Operator (i) is a corporation duly organized, validly existing and in good standing under the Laws of Oregon, (ii) is duly qualified and authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the character of its properties or the nature of its activities (including the operation of the Aircraft and each Item of Equipment) make such qualification necessary, and (iii) has the corporate power and authority to carry on its business as presently conducted and to perform its obligations under the Contract and the other Operative Documents;

(b)   Licenses.  Operator is a Certificated Air Carrier and holds all licenses, certificates, permits and franchises from the FAA and any other Aviation Authority or other Government Body having jurisdiction, necessary to authorize Operator to engage in air transport and to carry on its business as presently conducted and to be conducted with the Aircraft;

(c)   Authorization; Non-Contravention.   The execution, delivery and performance of the Contract and the other Operative Documents have been duly authorized by all necessary corporate action on the part of Operator, do not require any shareholder approval or approval or consent of any trustee or holders of any Debt or obligations of Operator (except for any approval or consent previously obtained) and do not and will not contravene any law, governmental rule, regulation or order binding on Operator or the articles of incorporation or bylaws of Operator or contravene the provisions of, or constitute a default under, or result in the creation of any Lien (other than as permitted under the LCF-LCL Terms) upon the property of Operator under any indenture, mortgage, deed of

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

trust, conditional sales contract, bank loan or credit agreement, contract or other agreement to which it may be a party or by which its property may be bound;

(d)     Consents.  Neither the execution and delivery by Operator of the Contract or any of the other Operative Documents, nor the consummation of any of the transactions by Operator contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action in respect of, the FAA or any other Aviation Authority or Government Body, or any Person;

(e)     Enforceability.  The Contract constitutes and the Delivery and Technical Acceptance and any other Operative Documents when entered into and delivered by Operator will constitute, valid and binding obligations of Operator enforceable in accordance with their respective terms;

(f)     Litigation.   There are no suits or proceedings pending or, to the knowledge of Operator, threatened against or affecting Operator in any court or before any regulatory commission, board or other administrative governmental agency, which if determined adversely to Operator would have a material adverse effect on the financial condition or business of Operator or the ability of Operator to perform its obligations under the Contract and the other Operative Documents;

(g)     Perfection.  Except for the procurement of the Required Approvals, no filing or recording of the Contract or of any other document is necessary under the Laws of any jurisdiction in order to fully protect, establish and perfect in all applicable jurisdictions Boeing's title to the Aircraft and each other Item of Equipment as against Operator and any third parties;

(h)     Financial Condition.   The audited balance sheet of Operator as of February 28, 2005 (the "Balance Sheet"), and the audited statements of profit and loss of Operator for the twelve months then ended, each certified on an unqualified basis by Operator's independent accountants heretofore furnished to Boeing, are complete and correct in all material respects and have been prepared in accordance with Accounting Principles.  Operator has no contingent obligations, liabilities for taxes or forward or long-term commitments which could have a material adverse effect on its financial condition, except as disclosed in the Balance Sheet or the notes thereto.  Since the date of the Balance Sheet, there has been no material adverse change in Operator's operations or financial condition from that reflected in such financial statement;

(i)     Pari Passu Ranking.  The obligations of Operator hereunder will be direct and unconditional general obligations of Operator, and will rank in right of payment at least pari passu with all Operator Liabilities, other than any relating to labor claims and tax obligations, whether now or hereafter outstanding. The pari passu ranking referred to in the preceding sentence refers to ranking in right of payment only, and does not address the issues of collateral security for any Debt or recourse in respect of any Debt against any direct or indirect guarantor thereof;

Boeing-Evergreen (10-19-05)          - 17 -

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

(j)     No Conflicting Agreements.  Operator is not a party to any agreement or instrument or subject to any charter or other restriction which individually or in the aggregate could reasonably be expected to adversely affect its ability to perform its obligations under this Contract.;

(k)     No Default.  No Default has occurred and is continuing;

(l)     Taxes.  As of the date hereof the payment to Boeing under this Contract will not be subject to Taxes, and as of the date hereof no withholding of any Taxes will be required upon such payment;

(m)     Tax Filings.  Operator has filed or caused to be filed all tax returns required to be filed and has paid or caused to be paid all Taxes shown to be due and payable thereon or on any assessment received by Operator, except for non-payments or failure to file which individually or in the aggregate could not reasonably be expected to have a material adverse effect on the financial condition or results of operations of Operator;

(n)     Accurate Information.  Each document, certificate or statement furnished to Boeing by or on behalf of Operator in connection with the transactions contemplated hereby does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein not misleading;

(o)     Not a Governmental Agency.  Operator is not an agency of any government and neither Operator nor any of its revenues, properties or assets enjoys any right of immunity from suit, set-off, attachment upon or prior to judgment or in aid of execution in respect of its obligations hereunder;

(p)     Compliance with Laws.  Operator is in compliance with all Laws to which Operator is subject except for noncompliance which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the business or financial condition of Operator;

(q)     Choice of Law.  The choice by Operator of the law of the State of Washington to govern this Contract is valid and binding under the Laws of the state of Operator's incorporation or any state or country in which Operator conducts business and a court in any such state or country would uphold such choice of law in a legal proceeding to enforce this Contract brought in such court;

(r)     Submission to Jurisdiction.  Operator has validly submitted to the jurisdiction of the courts of the State of Washington and the federal courts for the Western District of of Washington;

(s)     Qualification.  Boeing is not required to qualify for admission to do business under the Laws of the State of Oregon or any subdivision thereof, nor is Boeing required to take any other action which would (either alone or in connection with any other action) subject Boeing to liability or jurisdiction of any

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

courts or taxing authorities in or for the State of Oregon or any subdivision thereof by reason of the transactions contemplated by this Contract, including, without limitation, the enforcement of remedies thereunder;

(t)     Payment in Dollars.  Operator has obtained all consents, authorizations or approvals for the availability and transfer of Dollars required to make all payments due hereunder to Boeing (or its assignee or designee);

(u)     Own Account.  Operator represents that it is entering into this Contract and the other Operative Documents to which it is a party and the transactions contemplated hereby and thereby solely for its own account, risk and beneficial interest; and

(v)     Additional Represenatations.   Operator represents that (i) it is not a Person identified on, nor does it have any affiliation of any kind with any Person identified on, (A) any "watch list" established by the United States Office of Foreign Assets Control ("OFAC"), including, without limitation, OFAC's list of Specially Designated Nationals and Blocked Persons or (B) any "watch list" established by the United States Federal Bureau of Investigation; (ii) it is not a foreign shell bank or offshore bank; and (iii) it is not resident in, nor has funds that are transferred from or through, nor has operations in, any jurisdiction identified as non-cooperative by the Financial Action Task Force of the United States  or sanctioned by OFAC.

## ARTICLE 7.   POSSESSION, OPERATIONS AND MAINTENANCE

7.01   Possession and Use.  Operator shall not, without the prior written consent of Boeing, in any manner deliver, relinquish or transfer possession of any Item of Equipment; provided, however, that, so long as no Default or Event of Default shall have occurred and be continuing and so long as Operator shall comply with the provisions of Article 13 Insurance hereof, Operator may (a) deliver possession of an Item of Equipment to an FAA or JAA approved maintenance organization for service, repair, maintenance or overhaul work, or for alterations or modifications in or additions to an Item of Equipment to the extent required or permitted by the terms hereof, and (b) install an Engine on one of the Aircraft. Operator's right to use the Aircraft and each other Item of Equipment is limited solely to its timely performance of services under the Contract as and where required under the Contract.  Operator has no other right to use or possess any of the Aircraft or other Item of Equipment for any other purpose.  Boeing shall have the sole right to specify the goods to be transported under the Contract and the timing of such transport.   BOEING SHALL HAVE THE RIGHT TO PERFORM, FOR ANY REASON AND AT ANY TIME, ANY OR ALL OF THE SERVICES CONTRACTED FOR UNDER THE CONTRACT USING ANY OF THE AIRCRAFT OR OTHER ITEM OF EQUIPMENT. UPON REQUEST OF BOEING, OPERATOR WILL IMMEDIATELY SURRENDER AND DELIVER ANY SUCH AIRCRAFT AND/OR OTHER ITEM OF EQUIPMENT TO BOEING.

7.02   Assignment by Operator.  UNLESS OPERATOR FIRST OBTAINS BOEING'S

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

PRIOR WRITTEN CONSENT, ALL OR ANY PART OF OPERATOR'S RIGHTS HEREUNDER OR IN ANY ITEM OF EQUIPMENT SHALL NOT BE ASSIGNED, OR CONVEYED BY OPERATOR TO ANY PERSON, FIRM OR CORPORATION, AND ANY SUCH PURPORTED ASSIGNMENT OR CONVEYANCE SHALL BE VOID *AB INITIO* EXCEPT AS PERMITTED BY SECTION 7.01 HEREOF.

7.03   Lawful Operations.   Operator agrees throughout the Term (a) to maintain operational control of the Aircraft at all times, except as otherwise permitted in this Article 7, and (b) to use the Aircraft in accordance with all Laws of any Government Body having jurisdiction over Operator, or Operator's operations or the Aircraft. Operator will use the Aircraft solely as directed by Boeing. Operator will not employ, suffer or cause the Aircraft to be used in any business which is forbidden by Law, including without limitation any United States export and re-export controls and trade and economic sanctions laws and regulations, or in any manner which may render the Aircraft liable or susceptible to condemnation, destruction, seizure, or confiscation by any Government Body. Operator will not operate or permit the Aircraft to fly to any airport or country if so doing would cause Operator or Boeing to be in violation of any Law, including without limitation any United States export and re-export controls and trade and economic sanctions laws and regulations, applicable to either Boeing or Operator or to the Aircraft.

7.04   Insured Operations.   Operator agrees not to operate any Item, or suffer such Item to be operated; (a) unless such Item is covered by insurance as required by the provisions of Article 13 hereof; or (b) contrary to the terms of such insurance as required by the provisions of Article 13 (Insurance) hereof.

7.05   Maintenance.   Except as set forth in Article 21   Maintenance Reimbursements, Operator, at its own cost and expense, shall:  (a) inspect, service, repair, maintain and overhaul, test or cause the same to be done to each Item of Equipment furnished hereunder (i) so as to keep such Item in as good an operating condition and appearance as when delivered to Operator hereunder, ordinary wear and tear excepted, (ii) so as to keep such Item in compliance with all applicable maintenance requirements, including but not limited to all Manuals relating to the Aircraft, and all so-called "mandatory" and "alert" service bulletins and similar notices issued or supplied by or available through the manufacturer of such Item, (iii) so as to keep such Item in such operating condition as may be necessary to enable the airworthiness certification of such Item to be maintained in good standing at all times under the applicable rules and regulations of the Aviation Authority, (iv) so as to meet the standards observed by Operator with respect to aircraft of similar type (Boeing 747's and other wide body aircraft) owned or leased by Operator and operated on similar routes, and in a manner which does not adversely discriminate against the Aircraft compared to aircraft of similar type operated by Operator, (v) so as to keep the Aircraft in such operating condition as would be necessary to enable Boeing at the time of the return of the Aircraft by Operator to immediately obtain a standard Certificate of Airworthiness for the Aircraft from the FAA, and (vi) in strict compliance with the Maintenance Program applicable to any Item of Equipment including but not limited to the Aircraft, it being understood that Operator will promptly advise Boeing of any material change to the Maintenance Program; (b) carry out, on each Item, all applicable Airworthiness Directives which the FAA and the Aviation Authority may from time to time issue and which become due during or within eighteen (18) months after the scheduled end of the Term with respect to such Item; (c) to the extent Operator uses

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

third-party maintenance providers, such provider shall be an FAA-approved repair facility and all maintenance records, components, tags or other documentation received from such maintenance provider shall be made a part of the Aircraft Documentation to the extent required by the FAA; and (d) promptly furnish to Boeing upon Boeing's request such information as may be required to enable Boeing to file any reports required to be filed with any Government Body because of Boeing's interest in any Item of Equipment including but not limted to the Aircraft.  Without limiting the generality of the foregoing, Operator shall correct all corrosion, whether minor, moderate or severe as specified by the Manuals and the manufacturer of any Item.  In the event that compliance with any of the foregoing would require alteration of any Item of Equipment, Operator shall conform the Item thereto at its sole expense and shall maintain the Item of Equipment in proper condition for operation under the foregoing requirements.  Operator shall pay for and provide all electric power, oil, fuel and lubricants consumed by and required for the operation of the Aircraft and each other Item of Equipment, and all repairs, parts and supplies necessary therefor.

7.06    Insignia.  On the Delivery Date Operator, at its own expense, shall cause to be permanently affixed, and maintained throughout the Term, the following identification plates, each of which shall be fireproof and made of stainless steel with the appropriate legend prominently etched thereon:

(a)    Airframe Identification Plate.

Location:    In the cockpit of the Airframe in a location reasonably adjacent to and not less prominent than the airworthiness certificate for the Aircraft.

Size:    No smaller than four inches by six inches.

Legend:    THIS AIRCRAFT IS OWNED BY THE BOEING COMPANY, 100 N.RIVERSIDE, CHICAGO, IL  60606.

(b)    Engine Identification Plates.

Location:    In a prominent, visible location near the Engine Manufacturer's data plate.

Size:    No smaller than two inches by six inches.

Legend:    THIS ENGINE IS OWNED BY THE BOEING COMPANY.

Operator will not allow the name of any other person, association or corporation to be placed on the Airframe or any Engine as a designation that might be interpreted as a claim of ownership or of any interest therein.

7.07    Records.  Throughout the Term, Operator shall, at its own cost and expense, maintain in English and in a form consistent with FAA and Aviation Authority requirements, recommendations of suppliers of any Item of Equipment and with good commercial airline practice, all records, logs and other materials required by the FAA and the Aviation Authority to be maintained in respect of each Item of Equipment,

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

including accurate, complete and current written records of all maintenance carried out with respect to the Aircraft.  Operator shall permit Boeing or any authorized representative of Boeing to examine and make copies of such records at any reasonable time, at Boeing's cost.

## ARTICLE 8.   INSPECTION AND REPORTS

In addition to any inspection, audit, review and surveillance rights and rights to records and other document that Boeing has under any other provision of the Contract, Boeing also shall have the inspection rights and right to reports and other documents set forth below:

8.01    Inspection.  During the Term, Operator shall furnish to Boeing such additional information concerning the location, condition, configuration, use and operation of the Aircraft as Boeing may reasonably request, and Operator shall permit any person designated by Boeing pursuant to prior reasonable written notice, at Boeing's expense (or, if a Default or Event of Default shall have occurred and be continuing, at Operator's expense), to visit and inspect the Aircraft, and each other Item of Equipment, its condition, use and operation and the Aircraft Documentation and other documents maintained in connection therewith (and, in connection with any such inspection during a scheduled maintenance check, Operator shall cooperate with Boeing in connection with any inspection during such check) and to make copies of such Aircraft Documentation and other documents at Boeing's expense (or, if a Default or Event of Default shall have occurred and be continuing, at Operator's expense), and to visit and inspect the properties of Operator, and to discuss the affairs, finances and accounts of Operator with the principal officers of Operator, all at such reasonable times and as often as Boeing may reasonably request.   Boeing shall have no duty to make any such inspection and shall not incur any liability or obligation by reason of (and Operator's indemnity obligations under Article 14 will apply notwithstanding) not making any such inspection or making any such inspection of the Aircraft, other Item of Equipment, Aircraft Documentation, or other documents.

8.02    Reports.  Operator also agrees to furnish Boeing the following, in English, during the Term:

(i) as soon as available, but not later than  one hundred five (105) days after the close of each fiscal year of Operator, audited balance sheets, statements of income and changes in financial position, stockholders' equity and cash flows of Operator, as of the close of such fiscal year, certified by Operator's independent public accountants, including their unqualified opinion thereon;

(ii) as soon as available, but not later than forty-five (45) days after the close of each fiscal quarter of Operator, a balance sheet, statements of income and changes in financial position, stockholders' equity and cash flows of Operator, as of the close of such fiscal quarter;

(iii) together with each set of financial statements and reports referred to in clause (a) above, a certificate of Operator, signed by the President or Chief Financial Officer of

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

Operator, to the effect that the signer has made, or caused to be made under his supervision, a review of the financial condition of Operator during the accounting period covering such financial statement, and that such review has not disclosed the existence nor, after due inquiry, does the signer have any knowledge of the existence as at the date of such certificate, of any condition or event which constitutes a Default or an Event of Default, or, if such condition or event existed or exists, specifying the nature and period of existence thereof and what action Operator has taken or is taking or proposes to take with respect thereto;

(iv) annually, within thirty (30) days of each yearly anniversary of the Delivery Date, or more frequently if Boeing should reasonably request from time to time, a completed technical report in respect of the Aircraft substantially in the form of Attachment G hereto (a "Technical Report");

(v) at least thirty (30) days prior written notice of any significant scheduled maintenance check of the Aircraft including but not limited to maintenance covered in Section 21.01(Maintenance Reimbursements) (indicating the type of check and the time and place thereof);

(vi) after each month of operations, a utilization report containing, among other information, the Flight Hours and Cycles accumulated on each Item of Equipment during the previous month in the form of Attachment C hereto; and

(vii) from time to time, such other information as Boeing may reasonably request.

**ARTICLE 9.   OPERATOR'S COVENANTS**

In addition to the Operator's representations,warranties and covenants set forth in Exhibit G of the Contract, Operator covenants and agrees that, during the Term hereof:

9.01   Maintenance of Corporate Existence.  Operator will preserve and maintain (a) its corporate existence, and (b) all of its rights, privileges and franchises in every jurisdiction in which the character of the property owned or operated or the nature of the business transacted by it makes licensing or qualification necessary.

9.02   Notice of Litigation, Etc.  Operator will promptly give to Boeing a notice in writing of (a) any claim, cause of action, litigation or proceeding pending or threatened before any Government Body which might, if determined adversely to Operator, materially adversely affect Operator's financial condition, affairs or operations, and (b) any other matter which might materially adversely affect Operator's financial condition, affairs or operations or Operator's ability to perform under the Contract or any of the other Operative Documents.

9.03   Payment of Taxes.  Operator will pay or cause to be paid all Taxes imposed upon it or upon its income and profits, or upon any property belonging to it, prior to the date on which penalties attach thereto and all lawful claims, which, if not paid, might become a lien or charge upon the property of Operator; provided, however, that Operator shall not be required to pay any such Tax, the payment of which is being

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

contested in good faith and by appropriate proceedings, but only so long as (a) such proceedings do not involve any danger of adverse impact on business interests of Boeing or of the sale, forfeiture, detention or loss of the Aircraft or any Item or interest therein, (b) if Boeing so requests, Operator has provided Boeing with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim and (c) adequate reserves have been made for such Taxes or an adequate bond has been posted.

9.04    Consolidation, Merger or Sale.  Operator will not merge or consolidate with or into any other corporation or entity (except to the extent Operator is the successor, survivor or parent and, in such event, only if the tangible net worth of the successor, survivor or parent is, in Boeing's reasonable judgment, equal to or greater than the tangible net worth of Operator as of the Delivery Date), or sell, lease or otherwise dispose of all or substantially all of its assets or properties, without the prior written consent thereto by Boeing.  Operator will not, without the prior written consent of Boeing, authorize or become a party to any transaction (or series of transactions) which would result in a change of control of the voting stock of Operator.

9.05    No Distributions.  Operator shall not declare or pay any dividends, or otherwise make any distributions to its shareholders, at any time when a Default or Event of Default shall be continuing.

9.06    Landing Fees and Charges.  Operator shall promptly pay and discharge all airport landing fees, navigation charges and similar fees or charges imposed by any Government Body of any country to or over which Operator operates (including, without limitation, charges levied on behalf of member countries by the Central Route Charges Office of the Eurocontrol organization), promptly before the same become overdue. Within ten (10) days following request by Boeing (which request may not be made more often than semi-annually) Operator shall provide Boeing with copies of all statements received during the preceding six (6)month period from the Central Route Charges Office of the Eurocontrol organization or any similar Government Body in any country to or over which Operator operates the Aircraft and all airports at which the Aircraft is based from time to time or at which the Aircraft has made multiple landings during the preceding six (6) month period, which statements shall reflect the charges incurred and payments received during such six (6) month period, and such other information in respect thereof as Boeing may from time to time request to verify prompt payment of all such charges and fees.  In addition to the Eurocontrol Letter provided to Boeing on or before the Delivery Date, Operator shall at any time during the Term, upon demand, deliver to Boeing an irrevocable letter, in form and substance acceptable to Boeing, addressed to the airport or air navigation authority of any country to or over which Operator operates, in each case authorizing such authority to release to Boeing from time to time a statement of accounts of all such fees and charges then due in respect of all Aircraft which the Operator has the right to use under this Contract.

9.07    Certificated Air Carrier.  Operator will continue to be a Certificated Air Carrier authorized to engage in scheduled commercial passenger or cargo service.

9.08    Maintenance Provider.  Operator shall execute and maintain a contract with the Maintenance Provider for the maintenance of the Airframe and the Engines.

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

## ARTICLE 10. REPLACEMENT OF PARTS; ALTERATIONS, MODIFICATIONS AND ADDITIONS

10.01  Replacement of Parts.   Operator, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever.  In addition, in the ordinary course of maintenance, inspection, service, repair, overhaul or testing, Operator may remove any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, provided that Operator shall replace such Parts as promptly as practicable.  All replacement parts shall be free and clear of all Liens and shall be in as good an operating condition as, and shall have a value and utility at least equal to, the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof.

10.02  Title to Replaced Parts.  All Parts owned by Boeing hereunder at any time removed from any Item of Equipment shall remain the property of Boeing and subject to the Contract, no matter where located, until such time as such Parts shall be replaced by parts which have been incorporated or installed in or attached to such Item and which meet the requirements for replacement parts specified in Section 10.01 above. Immediately upon any replacement part becoming incorporated or installed in or attached to an Item as above provided, without further act, (a) title to the replaced Part shall thereupon vest in Operator, free and clear of all rights of Boeing and shall no longer be deemed a Part hereunder; (b) title to such replacement part shall thereupon vest in Boeing and be and become a "Part"; and (c) such replacement part shall become subject to the Contract and be deemed part of such Item for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Item.

10.03  Alterations, Modifications and Additions.   Operator, at its own expense, shall make alterations and modifications in and additions to an Item of Equipment as may be required from time to time under any law, rule, directive, bulletin, regulation or order of the Aviation Authority, or other Government Body having jurisdiction or issued by the manufacturer of such Item of Equipment.  In addition, Operator, at its own expense, with the prior written approval of Boeing, may from time to time make such alterations and modifications in and additions to each Item as Operator may deem desirable in the proper conduct of its business, provided that no such alteration, modification or addition diminishes the value, utility, condition or airworthiness of such Item below the value, utility, condition and airworthiness thereof immediately prior to such alteration, modification or addition, assuming such Item was then in the condition and airworthiness required to be maintained by the terms of this Contract.  Any alteration, addition or modification made pursuant to this Section 10.03 shall be effected in compliance with all applicable laws, rules and regulations of the FAA and the Aviation Authority.

10.04  Title to Parts.  Subject to the provisions hereof, title to all parts incorporated or installed in or attached or added to any Item as the result of any alteration, modification or addition made as contemplated in Section 10.03 hereof shall, without further act, vest in Boeing and become subject to the Contract; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing, at any time during the

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE**
**CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

Term, Operator may remove any Part from an Item of Equipment, provided that (a) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Item at the time of delivery thereof hereunder or any Part in replacement of, or substitution for, any such original Part; (b) such Part is not required to be incorporated or installed in or attached or added to such Item pursuant to the terms of Section 7.05 (Maintenance) hereof or the first sentence of Section 10.03; and (c) such Part can be removed from such Item without diminishing or impairing the value, utility or airworthiness which such Item would have had at such time had such alteration, modification or addition not occurred. Upon the removal by Operator of any such Part as above provided, title thereto shall, without further act, vest in Operator and such Part shall no longer be deemed a Part hereunder. Any Part not removed by Operator as above provided prior to the return of the Item to Boeing hereunder shall remain the property of Boeing.

## ARTICLE 11   GENERAL TAX INDEMNITY

11.01   (a)   Indemnity.   Whether or not any of the transactions contemplated hereby are consummated, Operator agrees to pay and, on written demand, to indemnify, defend, protect, save and hold Boeing and any of its successors, assigns and affiliates (each a "Tax Indemnitee") harmless from all license, recording, documentation and registration fees, sales and use taxes, income, franchise, stamp, customs, duties, excise, franchise, consumption, rental, ad valorem, property taxes (personal and real), value added taxes or similar taxes and any and all other taxes, levies, imposts, duties, charges, assessments or withholdings of any nature whatsoever together with any and all penalties, additions to tax, fines or interest thereon (collectively, "Taxes") imposed against any Tax Indemnitee, Operator or any Item of Equipment, by any United States federal, state or local government or taxing authority in the United States, or any territory or possession of the United States, or by any taxing authority or Government Body of a foreign country or international organization, upon or in connection with or with respect to any Item of Equipment, or upon the purchase, sale, ownership, delivery, leasing, subleasing, charter, possession, repossession, acceptance, rejection, transfer of title, return, location, importation, exportation, transport, rental, re-leasing, presence, condition, improvement, replacement, overhaul, control, imposition of any Lien (other than a Boeing Lien), abandonment, use, operation, financing, refinancing, registration, change in registration, reregistration, documentation, landing, departure, maintenance, repair, storage, modification, return or other disposition thereof, or upon the rentals, receipts or earnings (whether actual or deemed) arising therefrom, or upon or with respect to this Contract or any other Operative Documents and amendments and supplements hereto and thereto and the transactions contemplated hereby or thereby.

(b)   Withholding Taxes.   Operator agrees that all payments by Operator pursuant to this Contract and the other Operative Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future Taxes of any nature whatsoever now or hereafter imposed, levied, collected, withheld or assessed by any Government Body or taxing authority, required to be withheld or deducted from any amounts payable by, or on behalf of, Operator hereunder to Tax Indemnitee and Operator shall indemnify, defend and hold harmless Tax Indemnitee, on an after-tax basis, with respect to any withholding taxes whenever imposed (all such Taxes being

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

herein referred to as "Withholding Taxes"). If any Withholding Taxes are so required to be withheld or deducted from any payment made by Operator hereunder, Operator shall (i) pay to the appropriate Government Body the amount of such Withholding Taxes and make such reports and filings in connection therewith in the time and manner required by applicable Laws, (ii) at the time that the payment upon which the deduction or withholding applies is required to be made, pay to Tax Indemnitee any additional amount which is necessary in order for the net amounts received by Tax Indemnitee, after deduction or withholding of such Withholding Taxes, to equal the amounts payable to Tax Indemnitee had no such deduction or withholding been required and (iii) promptly forward to Tax Indemnitee an official receipt or other documentation reasonably satisfactory to Tax Indemnitee evidencing payment of such Withholding Taxes to such Government Body.  Tax Indemnitee agrees to deliver to Operator, at Operator's sole cost and expense, such official certificates or documents as may be reasonably requested in writing by Operator and necessary to establish that payments by Operator to Tax Indemnitee hereunder, or under this Contract are exempt from or are subject to a reduced rate of Withholding Tax imposed by any Government Body or taxing authority, so long as, Tax Indemnitee has determined that, it is entitled to claim such reduction or exemption without any cost or adverse consequence. If requested by Tax Indemnitee in connection with any request for certificates or documents hereunder, Operator shall provide Tax Indemnitee with blank forms and instructions for completion thereof.  If requested by Tax Indemnitee, Operator agrees to deliver to Tax Indemnitee, at Operator's sole cost and expense, such official certificates or documents as may be reasonably requested in writing by Tax Indemnitee and necessary to establish that payments by Operator to Tax Indemnitee hereunder, or under any other Operative Documents, are exempt from or are subject to a reduced rate of Withholding Tax imposed by any Government Body or taxing authority, so long as, Operator has determined that, it is entitled to claim such reduction or exemption without any cost or adverse consequence.

(c)  Limitation on Indemnity.  Notwithstanding the provisions of paragraphs (a) or (b) of this Section 11.01, Operator shall have no obligation thereunder as to:

(i)  Taxes based on or measured by the net income of any Tax Indemnitee imposed by the United States of America or by any state or local taxing authorities; provided, however, Operator shall be liable for such Taxes based on or measured by such Tax Indemnitee's net income if, but only if,

(A) Such taxes are in lieu of Taxes on any Item of Equipment (or any part thereof) which Operator would otherwise be required to pay hereunder, or

(B) Such taxes on net income would not have been imposed by the taxing jurisdiction but for or are increased as a result of any one or any combination of:

(x) the operation, registration, location, presence or use of any Item of Equipment (or any part thereof), in such jurisdiction,
(y) the place of incorporation, commercial domicile, or other presence in such jurisdiction of Operator, any subOperator or any user of or person in possession of any Item of Equipment (or any part thereof), or

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

(z) any payments made under the Contract and the other Operative Documents being made from such jurisdiction;

(ii)     Taxes to the extent imposed solely as a result of Tax Indemnitee's activities unrelated to the transactions contemplated by the Operative Documents;

(iii)    RESERVED;

(iv)     Taxes to the extent arising from any event or period after the later of the expiration or early termination of the Contract and, if required pursuant to the terms of the Contract, the return of the Aircraft (provided, that this clause (iv) shall not apply to Taxes imposed after such period arising as a result of payments by Operator under the Operative Documents after such period or attributable to events occurring prior to or coincident with such expiration or earlier termination of the Contract).

11.02  After-Tax Nature of Indemnity.  Operator further agrees that, with respect to any payment or indemnity hereunder, such payment or indemnity shall include any amount necessary to hold Tax Indemnitee harmless on an after-tax basis from all Taxes required to be paid (or which would have been required to be paid by Tax Indemnitee with respect to such payment or indemnity had Tax Indemnitee had sufficient gross income within the meaning of Section 61 of the Code, and other comparable provisions under state and local law, actually to pay tax at the highest marginal rates) by Tax Indemnitee with respect to such payment or indemnity under the Laws of any United States federal, state or local government or taxing authority in the United States, or under the Laws of any taxing authority or Government Body of any other country or international organization.

11.03  Application of Payments During Existence of a Default or Event of Default.  Any amount payable to Operator pursuant to the terms of this Article 11 shall not be paid to or retained by Operator if at the time of such payment or retention a Default or an Event of Default shall have occurred and be continuing under this Contract.  At such time as there shall not be continuing any such Default or Event of Default, such amount shall be paid to Operator to the extent not previously applied against Operator's obligations hereunder as and when due.

11.04  Survival of Indemnities.  Notwithstanding any other provision of the Operative Documents, all of the obligations of Operator under this Article 11 shall continue in full force and effect notwithstanding the expiration or earlier termination of this Contract and are expressly made for the benefit of, and shall be enforceable by, the Tax Indemnitees.

## ARTICLE 12.  DAMAGE, DESTRUCTION, REQUISITION OR CONDEMNATION

12.01  Event of Loss with Respect to an Airframe or an Airframe and the Engines Installed Thereon.  Upon the occurrence of an Event of Loss, or an event which with the passage of time would constitute an Event of Loss, with respect to the Airframe or to the Airframe and the Engines then installed on the Airframe, Operator shall forthwith (and in any event within three (3) days after such occurrence) give Boeing written notice of such

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

Event of Loss or such event. Operator shall pay or cause to be paid to Boeing in immediately available funds on the earlier to occur of (a) three (3) Business Days after the date Operator receives insurance proceeds from such Event of Loss, or an event which with the passage of time would constitute an Event of Loss or (b) one hundred twenty (120) days after the Event of Loss (i) then due and unpaid Supplemental Payments in respect of the Aircraft to and including such date, (ii) an amount equal to the Stipulated Loss Value in respect of the Aircraft and (iii) interest at the Incentive Rate on the unpaid balance of (i) and (ii) above from the due date until paid in full. At such time as Boeing has received the sum of (i), (ii) and (iii) above, Boeing shall Transfer to Operator all Boeing's right, title, and interest, in and to (1) the Airframe and Engines, (2) all claims for damage to such Items, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (3) all rights to any insurance claims under all insurance maintained by Operator hereunder except liability insurance with respect to the relevant Airfram and Engines.

12.02  Event of Loss with Respect to an Engine.  Upon the occurrence of an Event of Loss with respect to an Engine not then installed on the Airframe, or an Event of Loss with respect to an Engine installed on the Airframe not involving an Event of Loss with respect to the Airframe, Operator shall give Boeing prompt written notice thereof and Operator shall replace such Engine as soon as practicable after the occurrence of such Event of Loss by duly conveying to Boeing as a replacement for said Engine, title to another engine made by the Engine Manufacturer and of the same or an improved model and suitable for installation and use on the Airframe, which engine shall be free and clear of all Liens, and shall have a value and utility at least equal to, and be in as good an operating condition as, the Engine with respect to which such Event of Loss occurred, assuming such replaced Engine was of the value and utility and in the condition and repair as required by the terms hereof immediately prior to the occurrence of such Event of Loss. Such replacement engine, after approval and acceptance by Boeing, shall be deemed an Engine as defined herein, for all purposes hereunder. Operator agrees to take such action as Boeing may reasonably request to ensure that any such replacement engine shall be duly and properly titled in the name of Boeing and leased hereunder to the same extent as any Engine replaced thereby. Prior to or at the time of any such conveyance, Operator, at its own expense, will promptly (a) furnish Boeing with a warranty bill of sale, in form and substance satisfactory to Boeing, with respect to such replacement engine, (b) cause an amendment to the Contract in form and substance satisfactory to Boeing, subjecting such replacement engine to the Contract, to be duly executed by Operator, (c) furnish Boeing with such evidence of title to such replacement engine and of compliance with the insurance provisions of Article 13 hereof with respect to such replacement Engine as Boeing may reasonably request and (d) furnish Boeing with the report of a duly qualified appraiser or engineer reasonably satisfactory to Boeing as to such replacement engine's value, utility, condition and repair, and compliance with the related conditions specified above. Upon full compliance with this Section 12.02, such replacement engine shall be an "Engine" for all purposes of the Contract and Boeing shall Transfer to Operator all Boeing's right, title and interest in and to (i) the Engine with respect to which such Event of Loss occurred, (ii) all claims for damage to such Engine, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (iii) all rights to any insurance claims under all insurance maintained by Operator hereunder except liability insurance. Operator agrees that it shall at all

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

times during the Term maintain the Engines or other engines of the same or improved model and suitable for installation and use on the Airframe as the Engines on the Aircraft furnished hereunder.

12.03  Event of Loss With Respect to an LCL or LCF Tail Stand.  Upon the occurrence of an Event of Loss, or an event which with the passage of time would constitute an Event of Loss, with respect to an LCL or an LCF Test Stand, Operator shall forthwith (and in any event within three (3) days after such occurrence) give Boeing written notice of such Event of Loss or such event.  Operator shall pay or cause to be paid to Boeing in immediately available funds on the earlier to occur of (a) three (3) Business Days after the date Operator receives insurance proceeds from such Event of Loss or an event with the passage of time would constitute an Event of Loss, or (b) one hundred twenty (120) days after the Event of Loss an amount equal to the Agreed Value in respect of the LCL or LCF Tail Stand in respect of the LCL or LCF Tail Stand that suffered the Event of Loss and interest at the Incentive Rate on the unpaid balance of  such Agreed Value from the due date until paid in full.  At such time as Boeing has received the above sum, Boeing shall Transfer to Operator all Boeing's right, title, and interest in and to (1) the LCL or LCF Tail Stand, (2) all claims for damage to such Items, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (3) all rights to any insurance claims under all insurance maintained by Operator hereunder except liability insurance.

12.04  Application of Payments from Government Bodies for Requisition of Title.  Any payments (other than insurance proceeds the application of which is provided for in Article 13 (Insurance) hereof) received at any time by Boeing or Operator from any Government Body or other entity with respect to an Event of Loss resulting from the condemnation, confiscation or seizure of, or requisition of title to or use of the Aircraft, Airframe or Engines, will be applied as follows:

(a)  If such payments are received with respect to an Event of Loss relating to the Airframe and installed Engines, only so much of such payments as shall not exceed the amounts due under Section 12.01(i), (ii) and (iii) shall be applied in reduction of Operator's obligation to pay such amounts, if not already paid by Operator, or if already paid by Operator, shall be applied to reimburse Operator for its payment of such amounts, and the balance, if any, of such payments remaining thereafter will be paid over to or retained by Operator; and

(b)  If such payments are received with respect to an Engine under the circumstances described in Section 12.02, all such payments shall be paid over to Operator, at such time as Boeing shall have accepted an engine as replacement for such Engine in accordance with the provisions of said Section 12.02.

12.05  Requisition of Airframe for Use by Government.  In the event of the requisition for use by the United States Government ("Government") of the Airframe and the Engines or engines installed thereon during the Term therefor, Operator shall promptly notify Boeing of such requisition and all of Operator's obligations under the Contract with respect to such Items of Equipment shall continue to the same extent as if such requisition had not occurred (except that such obligations shall be suspended if and to

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

the extent that the performance thereof by Operator shall be made impossible as the result of such requisition); provided, that if such Items of Equipment are not returned by the Government prior to the end of the Term therefor, Operator shall be obligated to return such Items of Equipment to Boeing pursuant to, and in all other respects in compliance with the provisions of, Article 17 promptly upon their return by the Government, and, upon compliance therewith by Operator satisfactory to Boeing, Boeing shall (to the extent that it is lawfully able to do so) assign to Operator all of Boeing's rights against the Government with respect to the condition and fitness of such Items of Equipment, including all repair obligations of the Government upon return by it of the Items of Equipment at the expiration of the period of requisition for use. All payments received by Boeing or Operator from the Government for the use of such Items of Equipment during the Term therefor shall be paid over to, or retained by, Boeing; and all payments received by Boeing or Operator from the Government for the use of such item of Equipment after the Term therefor shall be paid over to or retained by Boeing.

12.06  Requisition of an Engine for Use by Government. In the event of the requisition for use by the Government of any Engine without the requisition for use of the Airframe, at Boeing's request Operator will replace such Engine hereunder by complying with the terms of Section 12.02 to the same extent as if an Event of Loss had occurred with respect to such Engine, and any payments received by Boeing or Operator from the Government with respect to such requisition shall be paid over to, or retained by, Operator.

12.07  Application of Payments During Existence of Default or Event of Default. Any amount referred to in Section 12.04 which is payable to Operator shall not be paid to Operator, if at the time of such payment a Default or an Event of Default shall have occurred and be continuing. In such event, all such amounts shall be paid to and held by Boeing as security for the performance by Operator of its obligations hereunder or, at Boeing's option, applied by Boeing toward payment of any of such obligations of Operator at the time due hereunder as Boeing may elect. At such time as Operator shall have cured all Defaults and Events of Default, all such amounts at the time held by Boeing in excess of the amounts, if any, which Boeing shall have elected to apply as above provided shall be paid to Operator.

12.08  Damage Notification. Operator will notify Boeing promptly of any loss, theft, requisition or damage to any Item of Equipment for which the cost of repairs or replacement is estimated to exceed U.S. fifty thousand dollars ($50,000).

## ARTICLE 13.  INSURANCE

13.01  Aviation And General Third Party Legal Liability Insurance. On or before the Delivery Date, throughout the Term and for a period extending two years following the later of (a) the end of the Term or (b) the date the Aircraft is returned to Boeing, Operator will carry or cause to be carried at its own expense with insurers of internationally recognized standing reasonably acceptable to Boeing, aviation legal liability insurance in respect of the Aircraft in amounts denominated in United States Dollars and customary for similar aircraft in Operator's fleet, but not less than U.S. five hundred million dollars ($500,000,000) combined single limit for bodily injury and property damage each

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

occurrence (and in the aggregate as respects aviation products/completed operations and third party liability war and allied perils), and subject to customary sub-limits for non-aviation coverages. Such insurance shall include third party legal liability including passenger liability, liability war and allied perils in accordance with Lloyd's Aviation Underwriters Association Standard Policy Form AVN52E (unless otherwise approved by Boeing in writing), property damage liability premises liability, products/completed operations liability and contractual liability and shall be in a form and substance reasonably satisfactory to Boeing. Operator will also carry or cause to be carried at its own expense with insurers reasonably acceptable to Boeing, general legal liability insurance (including coverage for all premises and operations, broad form property damage, and contractual liability (including without limitation, that specifically assumed herein) in respect of the LCL (including, without limitation, the operation thereof in, on and about airport premises) and LCF Tail Stand in amounts denominated in United States Dollars not less than U.S. ten million ($10,000,000). Operator covenants that any insurance policies carried in accordance with this Section 13.01 and any policies taken out in substitution or replacement for any of such policies shall: (A) be endorsed to name Boeing and its affiliates, subsidiaries, successors, assigns, and subcontractors and their respective directors, officers, agents, shareholders and employees as additional insureds for their respective interests with respect to the Aircraft, LCL and LCF Tail Stand (hereinafter each an "Additional Insured" and collectively the "Additional Insureds"); (B) provide that in respect of the interests of any Additional Insured in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and non-disclosure) of Operator or any other Person and (other than, as to any Additional Insured, any misrepresentation or non-disclosure of such Additional Insured) which results in a breach of any term, condition or warranty of such policies; (C) provide that none of the Additional Insureds shall have responsibility for the payment of premiums or any other amounts payable under such policies; (D) provide that insurers waive all rights of subrogation against (i) the Additional Insureds and (ii) the United States Government with regard to Operator's use of any military installation or facility; (E) provide that, if such insurance is canceled or allowed to lapse for any reason whatsoever, or if any material change is made in such insurance that adversely affects the interest of any Additional Insured, such cancellation, lapse or change shall not be effective as to any Additional Insured for thirty (30) days (seven (7) days, or such other period as is then customarily obtainable in the industry, in the case of any war and allied perils liability coverage) after the giving of written notice from such insurers or Operator's appointed insurance broker to Boeing; (F) be primary without right of contribution from any other insurance maintained by any Additional Insured; (G) provide a severability of interests provision applicable to each insured and Additional Insured under the policy such that all of the provisions of the insurance required hereunder, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured and Additional Insured; (H) waive any right of the insurers to any setoff, counterclaim or other deduction against the Additional Insureds, and; (I) provide for worldwide coverage in respect of the Aircraft, subject to such limitations and exclusions as may be expressly set forth in the certificates of insurance delivered pursuant to Section 13.04 provided such limitations and exclusions are not applicable to the territories where the Aircraft is operated by Operator, or as Boeing may otherwise agree in writing.

13.02   Aircraft Hull and Physical Damage Insurance.   On or prior to the Delivery Date

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

and throughout the Term, Operator covenants to maintain or cause to be maintained in full force and effect, at its own expense and on terms substantially similar to and no less favorable than insurance carried by Operator on similar aircraft in its fleet, all-risk ground and flight aircraft hull insurance covering the Aircraft including coverage of the Engines and Parts while temporarily removed from or not installed on the Aircraft and not replaced with similar components in amounts denominated in United States Dollars not less than, in respect of the Aircraft, the Stipulated Loss Value and with respect to any Engines or Parts while removed from the Aircraft on a replacement value basis.

Operator agrees to maintain or cause to be maintained in full force and effect hull war and allied perils insurance in respect of the Aircraft for not less than the amounts set forth in the preceding paragraph in accordance with Lloyd's Aviation Underwriters Association Standard Policy Form LSW 555B (provided that any exclusion for confiscation by the government of the country in which the Aircraft is registered shall be deleted) unless otherwise approved by Boeing in writing.

On or prior to the Delivery Date and throughout the Term, Operator covenants to maintain or cause to be maintained in full force and effect, at its own expense, with insurers reasonably acceptable to Boeing, physical damage insurance covering each LCL and LCF Tail Stand in an amount not less than four million one hundred forty thousand dollars ($4,140,000) and eight hundred and five thousand dollars ($805,000), respectively ("Agreed Value") and any other Item of Equipment furnished hereunder (for which a Stipulated Loss Value or Agreed Value is not given) on a replacement value basis.

Operator covenants that all policies and subsequent policies taken out in accordance with this Section 13.02 shall: (A) in respect of the Aircraft, be issued by insurance companies or underwriters of internationally recognized standing in the aviation industry and reasonably acceptable to Boeing; (B) be in form and substance reasonably acceptable to Boeing; (C) be endorsed to name Boeing as the sole loss payee in respect of claims that become payable on the basis of a total loss and shall provide that any other loss shall be settled (net of any relevant policy deductible) with such party(ies) as may be necessary to repair the Aircraft, LCL or LCF Tail Stand unless otherwise agreed in writing by Boeing; (D) be amended to name the Additional Insureds as additional insureds for their respective interest with respect to the Aircraft, LCL and LCF Tail Stand; (E) provide that, in respect of the interest of any Additional Insureds in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and non-disclosure) of Operator or any other Person (other than, as to any Additional Insured, any misrepresentation or non-disclosure of such Additional Insured) which results in a breach of any term, condition or warranty of such policies; (F) provide that none of the Additional Insureds shall have responsibility for the payment of premiums or any other amount payable under such policies; (G) provide that insurers shall waive all rights of subrogation as against (i) the Additional Insureds and (ii) the United States Government with regard to Operator's use of any military installation or facility; (H) provide that, if such insurance is canceled or allowed to lapse for any reason whatsoever, or if any material change is made in such insurance which adversely affects the interest of an Additional Insured, such cancellation, lapse or change shall not be effective as to any Additional Insured for thirty (30) days (seven (7) days, or such other period as is then customarily obtainable in the industry, in the case of any hull war and

LCF Operator Service

allied perils coverage) after the giving of written notice from such insurers or Operator's appointed insurance broker to Boeing; (I) waive any right of the insurers to any setoff, counterclaim or other deduction against the Additional Insureds; (J) in respect of the Aircraft, provide for worldwide coverage, subject to such limitations and exclusions as may be set forth in the certificates of insurance delivered pursuant to Section 13.04 provided such limitations and exclusions are not applicable to the territories where the Aircraft is operated by Operator, or as Boeing may otherwise agree in writing; (K) in respect of the Aircraft, contain a 50/50 claims funding clause in the form of Lloyd's Aviation Underwriters Association Standard Policy Form AVS103 in the event of a dispute as to which policy in respect of the hull insurance set forth in this Section 13.02 shall pay in the event of a loss, and; (L) in respect of the Aircraft, have deductibles (not applicable in case of a total, constructive total and/or arranged total loss) standard in the industry which do not exceed, per occurrence, the lesser of (i) fifty thousand dollars ($50,000) and (ii) such amounts carried by Operator with respect to other aircraft operated on similar routes or which are otherwise reasonably acceptable to, and approved in writing by Boeing, provided however, any deductibles shall be assumed by and at the sole risk of Operator and to the extent applicable shall be paid by Operator.

13.03  Default.   If Operator shall default in effecting, keeping or maintaining any insurance or if any insurance shall for any reason become void, Boeing may (but without any obligation to do so and without prejudice to Boeing's other rights and remedies hereunder) effect, keep up or maintain such insurance at the cost of Operator and Operator will forthwith upon demand repay to Boeing all premiums and other moneys from time to time paid or payable by Boeing in respect of such insurance.

13.04  Certificates.   Not less than ten (10) business days before the Delivery Date, unless otherwise approved by Boeing in writing, and promptly upon each renewal thereafter, Operator will furnish to Boeing certificates of insurance written in English from an authorized representative of the insurers providing the insurance required hereunder and certificates of reinsurance from reinsurance brokers (together with in respect of the Aircraft, a letter of undertaking from each of such representative and such reinsurance brokers and an opinion by an independent reinsurance broker stating that such insurance and reinsurance complies with the terms hereof) describing in detail the insurance and reinsurance carried and maintained on the Aircraft pursuant to this Contract.   Such certificates of insurance shall be in form and substance reasonably satisfactory to Boeing.   The policies providing such insurance may be inspected by Boeing upon request.  Failure of Operator to furnish certificates of insurance or procure and maintain the insurance required herein or the failure of Boeing to request such certificates or other proof of coverage shall not constitute a waiver of Operator's obligations hereunder.

13.05  Premiums.   Operator agrees to pay (or to cause to be paid) the premiums (or installments thereof) as required by the terms of such policies and produce to Boeing upon request receipts in respect of payment of such premiums (or installments thereof) or other evidence of such payments as Boeing may reasonably request.  In the case of renewals of such policies, Operator shall cause to be produced to Boeing evidence of such renewal as soon as practicable and in any event within seven (7) days after the date of renewal and shall advise Boeing of such renewal not later than the Business Day immediately preceding such renewal date and Operator shall pay or cause to be paid the

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

renewal and other premiums (and installments thereof) as required by the terms of such policies.

13.06  Claims.  After an Event of Loss in relation to the Aircraft shall have occurred and so long as no Default or an Event of Default shall have occurred and be continuing, Operator may pursue any and all claims against the insurers in respect of the insurance with respect to the Aircraft, subject to consultation with Boeing; provided that no settlement or compromise of any such claim may be made without the approval of Boeing (which approval shall not be unreasonably withheld or delayed).  Should a Default or an Event of Default have occurred and be continuing and any claim be made under any of the insurance policies, Boeing shall have full power to make, enforce, settle or compromise all claims with the insurers in respect of the insurance (other than the liability insurance) or for compensation and to sue for, recover, receive and give discharge for all moneys payable by virtue thereof, to be held and applied in accordance with Section 13.02.  Operator shall irrevocably and unconditionally assign the insurance to Boeing if such an assignment is advisable for the purpose of the preceding sentence.  Operator shall do or cause to be done all things necessary and provide or cause to be provided all documents, evidence and information to enable the assignee or loss payee referred to above to collect or recover any moneys due or to become due in respect of the insurance.

13.07  Reinsurance.  If the insurance required in respect of the Aircraft by Sections 13.01 and 13.02 is not provided by internationally recognized insurers in the U.S. and European markets, Operator shall ensure that in respect of insurance required to be maintained by Operator in accordance with the provisions in this Article 13 the insurers maintain reinsurance covering identical subject matter and risk for an amount (which shall not be less than one hundred percent (100%) (or, in the event of limitations imposed by applicable law, the maximum amount permitted to be reinsured under such law, but in no case less than ninety percent (90%)) of the coverage amount under this Article 13) and with reinsurers in the international aviation reinsurance market reasonably acceptable to Boeing.  Operator shall grant or caused to be granted to Boeing assignments of insurance and reinsurance benefits and any such reinsurance shall:

(a)  be on the same terms as the original insurances; and

(b)  contain a "cut-through" clause satisfactory to Boeing providing that, in the event of any claim arising under the reinsurance, the reinsurers thereunder shall, in lieu of payment to the original insurer or its successors in interest and assigns, pay to Boeing (or its assigns) as loss payee that portion of any loss due for which the reinsurers thereunder would but for this cut-through clause be liable to pay the original insurer or its successors in interest and assigns, it being understood and agreed (and Operator agreeing to obtain the agreement of its original insurers for the benefit of Boeing and the reinsurers) that any such payment by the reinsurers thereunder shall fully discharge and release the original insurers from any and all further liability in connection therewith; and

(c)  provide for payment to be made directly to Boeing (or its assigns) as provided herein notwithstanding (i) any bankruptcy, insolvency, liquidation or dissolution of

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

the original insurer(s), and/or (ii) that the original insurer(s) have made no payment under the primary insurance policies.

13.08 <u>Lloyd's Endorsements</u>.  Operator may procure endorsements to the relevant insurance policies required to be maintained pursuant to this Article 13 so as to incorporate the terms of Lloyd's Aviation Underwriters Association Standard Policy Form AVN 67B (or any updated version thereof if such updated endorsement shall then be the general aviation industry standard) into such insurance policies in which event, to the extent that any provision of any such Form AVN 67B (or any updated version thereof, as the case may be) endorsement conflicts or is otherwise inconsistent with the requirements of any provision of this Contract relating to insurance, then so long as it shall remain general international industry practice to insure aircraft on the basis of such endorsement, such conflicting or inconsistent provision of this Contract shall be of no further force and effect and such endorsement shall be deemed to satisfy the requirements of each such conflicting or inconsistent provision of this Contract.

13.09 <u>Self-Insurance</u>.  Except for the deductibles permitted by Section 13.02 hereof or otherwise permitted in writing by Boeing, Operator shall not be permitted to self-insure against any of the risks required to be covered by the insurance described in this Article 13.

## ARTICLE 14.  GENERAL INDEMNIFICATION

14.01  Operator agrees to assume liability for, and does hereby indemnify, defend, protect, save and keep harmless Boeing and its affiliates, subsidiaries, successors, assigns and subcontractors and their respective directors, officers, shareholders, agents and employees (collectively, the "Indemnified Parties" and each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities (including, but not limited to, any claim or liability for strict liability in tort or otherwise imposed including, without limitation, liability arising under any applicable environment or noise or pollution control statute, rule or regulation), obligations, demands, suits, penalties, judgments or causes of action and all legal proceedings, whether civil or criminal, penalties, fines and other sanctions, and any costs and expenses in connection therewith including, without limitation, legal fees and expenses of whatever kind and nature (whether or not also indemnified against by any other Person under any other document), which may result from or grow or arise in any manner out of the condition, ownership, manufacture, construction, design (including, without limitation, latent and other defects whether or not discoverable by Operator or Boeing and any claim for patent, trademark or copyright infringement), acceptance, non-acceptance, rejection, delivery, lease, possession, return, disposition, maintenance, inspection, storage, use or operation (in each and every case) of the Aircraft or any other Item of Equipment either in the air or on the ground (except, with respect to an Indemnified Party, claims to the extent finally, non-appealably judicially determined to be caused by the gross negligence or willful misconduct of such Indemnified Party), or arising from the material or any article used therein or from the design, testing or use thereof or from any maintenance, service, repair, overhaul or testing of the Aircraft or any other Item regardless of when such defect shall be discovered, whether or not such Aircraft or any other Item is at the time in

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

the possession of Operator and whether it is in the United States of America or any other country.

14.02   Operator hereby waives and releases any claim now or hereafter existing against each Indemnified Party on account of any and all claims, demands, suits, judgments or causes of action for or on account of or arising or in any way connected with injury to or death of personnel of Operator or loss or damage to property of Operator or the loss of use of any property which may result from or grow or arise in any manner out of the condition, use or operation of the Aircraft or any other Item, either in the air or on the ground during the Term hereof, or which may be caused during the Term hereof by any defect (whether latent or patent) in the Aircraft or any other Item from the material or any article used therein or from the design, testing or use thereof or from any maintenance, service, repair, overhaul or testing of the Aircraft or any other Item regardless of when such defect shall be discovered, whether or not such Aircraft or any other Item is at the time in the possession of Operator and whether it is in the United States of America or any other country.

14.03   Operator further agrees that, with respect to any payment or indemnity to any Indemnified Party hereunder, such payment or indemnity shall include any amount necessary to hold the recipient of the indemnity harmless on an after-tax basis from all taxes required to be paid (or which would have been required to be paid by such Indemnified Party with respect to such payment or indemnity had such Indemnified Party had sufficient gross income within the meaning of Section 61 of the Code, and the applicable state and local law, actually to pay tax at the highest marginal rate) by such recipient with respect to such payment or indemnity under the Laws of any federal, state or local government or taxing authority in the United States, or under the Laws of any taxing authority or governmental subdivision of any other country.

## ARTICLE 15.  LIENS

Operator shall not, directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to any Item of Equipment or title thereto or any interest therein or in the Contract, except (i) the respective rights of Boeing and Operator as herein provided; (ii) Boeing's Liens; (iii) Liens for Taxes either not yet due or being contested in accordance with Article 11 hereof; and (iv) inchoate materialmen's, mechanics', workmen's, repairmen's, employees' or other like liens arising in the ordinary course of business and for amounts the payment of which is either not yet delinquent or is being contested in good faith (and for the payment of which adequate reserves have been provided) by appropriate proceedings so long as such proceedings do not involve any danger of sale, forfeiture or loss of any Item of Equipment or any interest therein. Operator shall promptly, at its own expense, take such action as may be necessary to duly discharge any such Lien not excepted above if the same shall arise at any time with respect to an Item of Equipment leased hereunder or this Contract.

## ARTICLE 16.  REGISTRATION, RECORDATION AND FURTHER ASSURANCES

LCF Operator Service

16.01   Registration; Recordation.   The Aircraft are currently registered in the name of Boeing with the FAA and Boeing shall cause such registration to remain in effect with the FAA at all times during the Term.  Operator shall, at Operator's cost and expense, cause the Contract, all attached Attachments, Exhibits and Schedules (to the extent such documents do not contain proprietary economic information), the Delivery and Technical Acceptance and any and all additional instruments which shall be executed pursuant to the terms hereof so far as permitted by applicable law or regulations, to be kept, filed and recorded and to be re-executed, refiled, and re-recorded or registered at all times with the Aviation Authority, and in such other places or with such other Government Bodies as Boeing may reasonably request to perfect and preserve Boeing's rights hereunder, and Operator shall, as may be reasonably requested by Boeing, furnish to Boeing an opinion of counsel or other evidence satisfactory to Boeing of each such filing or refiling and recordation or re-recordation.

16.02   Further Assurances.  Without limiting the foregoing, Operator shall do or cause to be done, at Operator's cost and expense, any and all acts and things which may be required under the terms of the Geneva Convention to perfect and preserve Boeing's interest in and to the Aircraft within the jurisdiction of any signatory state or country which has ratified said Convention and in the territory of which Operator may operate the Aircraft as Boeing may reasonably request.  Operator shall also do or cause to be done, at its own expense, any and all acts and things which may be required under the terms of any other agreement, treaty, convention, pact or by any practice, custom, or understanding recognized as having wide application or control involving any jurisdiction in which Operator may operate, or any and all other acts and things which Boeing may reasonably request and which are necessary, to perfect and preserve the rights of Boeing hereunder, in and to any Item of Equipment, within any such jurisdiction.  In addition, Operator will promptly and duly execute and deliver to Boeing such further documents and assurances and take such further action as Boeing may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Contract and the other Operative Documents and to establish and protect the rights and remedies created or intended to be created in favor of Boeing hereunder, including, without limitation, if requested by Boeing, at the expense of Operator, the execution and delivery of supplements or amendments hereto, in recordable form, subjecting to this Contract any replacement or substituted engine and the recording or filing of counterparts hereof, or of financing statements with respect hereto, in accordance with the laws of such jurisdictions as Boeing may reasonably deem advisable.

## ARTICLE 17.  RETURN OF AIRCRAFT AND AIRCRAFT DOCUMENTATION

17.01   Aircraft Return Conditions.  Upon return of the Aircraft to Boeing hereunder, the Aircraft shall meet the conditions set forth in Schedule 2.

17.02   Pre-Return Report and Inspections.  Twelve (12) months prior to the termination of the Contract, Operator shall provide to Boeing a completed current Technical Report in Boeing's standard format.  Within sixty (60) days prior to the redelivery of the Aircraft, Operator shall make the Aircraft and personnel available to Boeing for a detailed

LCF Operator Service

inspection of the Aircraft and records in order to verify that the condition of the Aircraft and records comply with all requirements of the Contract. On the earlier of the date the Aircraft commences its return "C" check or fifteen (15) days prior to the redelivery of the Aircraft, Operator shall make the Aircraft and personnel available to Boeing for a final inspection which shall include ground functional checks, inspections, power assurance runs (including assurance of EGT margins) and video borescope inspections of the Engines by a Boeing selected source (including any engine to be returned as provided for herein) and operational test flight(s) of the Aircraft not less than four (4) hours, conducted by Operator using the Manufacturer's recommended test flight procedures. Boeing shall be permitted to have four representatives conduct the final inspection and to be direct observers of the test flight(s). All discrepancies to the return condition requirements hereof discovered during such inspections shall be corrected by Operator, at Operator's expense. The cost of the final inspection, including the operational test flight(s), shall be paid by Operator. In the event the operational test flight(s) reveals any items or conditions that would prevent the Aircraft from meeting its return conditions, Boeing shall not be deemed to have taken delivery of the Aircraft until such time as all identified items or conditions have been rectified to Boeing's satisfaction.

17.03   Return of other Items of Equipment.  Except as otherwise provided herein, at the expiration of the Term for any Item of Equipment (other than the Aircraft) or upon the sooner termination of this Contract, Operator, at its own expense, shall return such Item of Equipment to Boeing by delivering the same to Boeing at a location designated by Boeing. Such Item of Equipment, at the time of return to Boeing, shall be in the same configuration as on the Delivery Date, unless otherwise mutually agreed in writing between the parties hereto, fully equipped, with all Parts and with all other equipment as when delivered to Operator. Operator shall not be relieved of any of its duties, obligations, covenants or agreements under this Agreement prior to the return of all Items of Equipment in the manner and condition required with respect to such return. Each Item of Equipment, upon redelivery pursuant hereto, (a) shall be free and clear of all Liens and (b) shall be in the same operating condition, ordinary wear and tear excepted, as when delivered to Operator hereunder. The parties will execute a redelivery certificate evidencing the redelivery of such Items of Equipment to Boeing.

17.04 through 17.07   Reserved.

17.08   Storage.  Upon any expiration or termination of Contract, at the written request of Boeing, Operator will arrange, or will cause to be arranged, secured ramp storage facilities and storage maintenance for the Aircraft at an appropriate storage area (which shall include any of Operator's hangar facilities suitable for such aircraft) for the Aircraft and each Item of Equipment for a period not exceeding thirty (30) days, at Boeing's risk and expense (Boeing to reimburse Operator for Operator's incremental costs of such storage and insurance). Notwithstanding the previous sentence, if an Event of Default has occurred and is continuing, all storage, maintenance, insurance costs and risk of loss for the Aircraft shall be for the account of Operator.

17.09   Maintenance at Boeing's Request.  Upon receipt of written notice from Boeing not less than sixty (60) days prior to any expiration or termination of this Contract, Operator agrees to perform maintenance reasonably requested by Boeing to the Airframe and/or the Engines. Such maintenance shall be done in the same manner and

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

with the same care as used by Operator with similar airframes and engines of its own and shall be completed as promptly as possible after any such termination of the Contract as to such Airframe or Engines, and Boeing shall reimburse Operator in an amount equal to Operator's standard contract rates, if any, therefor, or if such maintenance is performed by someone other than Operator, the actual amount paid therefor by Operator.

17.10   Deregistration and Export.  At such time as the Operator is obligated to redeliver the Aircraft to the Boeing pursuant to the Contract, the Operator shall upon the request of Boeing:

> (a)      promptly take all such steps (not including procuring the discharge of any Boeing's Liens) as may be necessary to cancel the existing registration of the Aircraft and obtain and deliver to Boeing all certificates relating to the Aircraft required by applicable law or any transfer of or alteration to the registration thereof;
>
> (b)      provide to Boeing all assistance as Boeing may reasonably request so as to enable Boeing to obtain any required documents from or in the State of Registration or from any Aviation Authority or from or in such other country in which the Aircraft has been operated or is for the time being located; and
>
> (c)      provide to Boeing such assistance as Boeing may reasonably require so as to enable the Aircraft to be registered and certified as to airworthiness under any applicable Laws of any country as Boeing may reasonably request.

17.11   Aid in Disposition.   Operator agrees that during the last one hundred and eihty (180) days of the Term and during the storage period set forth in Section 17.08, if any, it will cooperate in all reasonable respects with the efforts of Boeing to lease or sell the Aircraft, including, without limitation, permitting potential operators, lessees or purchasers to inspect the Aircraft and the records relating thereto, provided that, so long as no Default or Event of Default has occurred and is continuing, Operator shall not be required for such purpose to unreasonably interfere with the use of the Aircraft, except during the last 30 days of the Term, or incur out-of-pocket expenses for which it is not to be reimbursed.

17.12   Assistance with Assignments.    Upon return, Operator shall to the extent necessary, reassign or otherwise confirm to Boeing, at the expense of Operator, the benefit of any indemnities or warranties available to Operator from any manufacturer, supplier, overhaul or repair facility, or servicer of any Item of Equipment.

## ARTICLE 18.  EVENTS OF DEFAULT

In addition to the Events of Default set forth in Exhibit G to this Contract, the following events shall constitute Events of Default (whether such events shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree, order, rule or regulation of any Government Body):

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

(a)     Operator fails to make any Supplemental Payments when due; or

(b)     Operator fails to procure and maintain in full force and effect any insurance
required by Article 13 (Insurance) hereof; or

(c)     Operator fails to perform or observe any of the covenants, conditions or
agreements to be performed or observed by it under Sections 7.01, 7.02, 7.03,
7.04, 7.06 (first sentence), 9.01(a), 9.04 or 9.08 hereof; or

(d)     Operator fails to perform or observe in any material respect any other of the
covenants, conditions, or agreements to be performed or observed by it
hereunder or under any other Operative Document and such failure continues for
a period of twenty-four (24) hours after written notice thereof from Boeing to
Operator; or

(e)     Any representation or warranty made by Operator herein or in any document or
certificate furnished to Boeing in connection herewith or pursuant hereto
(including without limitation financial statements) proves to be incorrect in any
material respect; or

(f)     Any license, consent, approval or authorization of, or any filing or registration
with, any Government Body necessary for the performance by Operator of its
obligations under the Contract or any other Operative Document or in connection
herewith (including, without limitation, the filing or registration of the Aircraft or
the Contract) or therewith, shall be revoked, not applied for or not issued or shall
cease to remain in full force (or, as applicable, is not duly renewed upon the
terms consistent with the original approval or otherwise satisfactory to Boeing) or
any of the foregoing shall be modified and any such revocation, non-application
or issuance or modification would materially adversely affect (in the opinion of
Boeing) the rights and remedies of Boeing under the Contract; or

(g)     Operator (or any affiliate of Operator) shall (i) default in any payment or other
obligation in any contract between it and Boeing (or any affiliate of Boeing) and
such default shall continue beyond any applicable grace period; (ii) default in any
payment or other obligation under any operating lease of aircraft or aircraft-
related equipment and such default shall continue beyond any applicable grace
period or extension thereof; or (iii) default in payment of any Operator Liabilities
in excess of five hundred thousand dollars ($500,000) (with respect to either
principal or interest) when the same becomes due whether by acceleration or
otherwise after expiration of any applicable grace period or extension thereof; or
(iv) fail to perform or observe in any material respect any provision (unless such
provision has been waived) in any agreement securing or relating to any
Operator Liability, and the effect of such failure is to cause such Operator Liability
to become due prior to its stated maturity; or

(h)     Operator consents to the appointment of a receiver, trustee or liquidator of itself
or of a substantial part of its property, or Operator admits in writing its inability to
pay its debts generally as they become due, or makes a general assignment for

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

the benefit of creditors, or Operator files a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy or reorganization laws (as now or hereafter in effect) or an answer admitting the material allegations of a petition filed against Operator in any such proceeding, or Operator by voluntary petition, answer or consent seeks relief under the provisions of any other now existing or future bankruptcy or other similar law providing for the reorganization or winding-up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors; or

(i)  An order, judgment or decree is entered in any proceedings by any court of competent jurisdiction appointing, with or without the consent of Operator, a receiver, trustee or liquidator of Operator or of any substantial part of its property, or any substantial part of the property of Operator is sequestered, and any such order, judgment or decree of appointment or sequestration remains in force undismissed, unstayed or unvacated for a period of thirty (30) days after the date of entry thereof; or

(j)  A petition against Operator in a proceeding under the bankruptcy laws or other insolvency laws (as now or hereafter in effect) is filed, and any decree or order adjudging Operator as bankrupt or insolvent in such proceeding remains in force undismissed or unstayed for a period of thirty (30) days after such adjudication or, in case the approval of such petition by a court of competent jurisdiction is required, the petition as filed or amended shall be approved by such a court as properly filed and such approval shall not be withdrawn or the proceeding dismissed within thirty (30) days thereafter, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Operator, any court of competent jurisdiction shall assume jurisdiction, custody or control of Operator or of any substantial part of its property and such jurisdiction, custody or control remains in force unrelinquished, unstayed or unterminated for a period of thirty (30) days; or

(k)  (i) Operator voluntarily suspends all or substantially all of its commercial airline operations; (ii) the franchises, concessions, permits, rights or privileges required for the conduct of the business and operations of Operator are revoked, canceled or otherwise terminated; or (iii) the free and continued use and exercise thereof is curtailed or prevented, and as a result of any of the foregoing the preponderant business activity of Operator ceases to be that of a commercial airline; or

(l)  there shall be any change (or such change shall be enacted or made by notice or otherwise and shall be scheduled to become thereafter effective) in any Law (or in the interpretation thereof) of the jurisdiction of Operator's incorporation or any jurisdiction in which Operator conducts business which materially adversely affects (i) any of Boeing's material rights hereunder or under the Operative Documents; (ii) the validity, legality or perfection of any of the Operative Documents or Boeing's title to any Item, or; (iii) materially adversely affects Operator's ability to meet its obligations hereunder; or

LCF Operator Service

(m)  any Government Body shall have condemned, seized or appropriated all or any substantial portion of the property of Operator; or

(n)  judgment for the payment of money in excess of five hundred thousand dollars ($500,000) is rendered against Operator and the same shall remain undischarged for a period of sixty (60) days during which execution of such judgment shall not be effectively stayed, or an attachment or other Lien shall be issued against any of the property of Operator for an amount in excess of five hundred thousand dollars ($500,000) and shall remain undischarged or unbonded for sixty (60) days.

## ARTICLE 19. REMEDIES

Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, all rights of Operator hereunder will immediately cease and terminate (but Operator's obligations hereunder will continue, including the obligations to protect and insure each Item of Equipment as required under the Contract). In addition, Boeing may exercise any one or more of the following remedies with respect to all or any part of any Item of Equipment as Boeing, in its sole discretion, shall elect, in addition to any other rights and remedies available to Boeing under law or equity and subject to the requirements of applicable law:

19.01  Terminate the Contract and demand that Operator, and Operator shall upon the written demand of Boeing and at Operator's expense, forthwith return the Aircraft and all other Items of Equipment to Boeing in the manner and condition required by, and otherwise in accordance with all of the provisions of, Article 17 (Return of Aircraft and Aircraft Documentation) hereof as if such Aircraft and Items were being returned at the end of the Term (and, at Boeing's option, in such condition as to revert to the condition of the Aircraft prior to any alterations, modifications or additions effected pursuant to the second sentence of Section 10.03 hereof); or Boeing, at its option and to the extent permitted by applicable law, may enter upon the premises where the Airframe, any Engine or any Item of Equipment is located and take immediate possession of and remove the same by summary proceedings or otherwise, all without liability accruing to Boeing for or by reason of such entry or taking of possession whether for the restoration of damage to property caused by such taking or otherwise; or

19.02  In addition, Operator shall be liable for all legal fees and experts' fees and expenses and other costs and expenses incurred by Boeing by reason of the occurrence of any Event of Default or the exercise of Boeing's remedies with respect thereto, including (a) all costs and expenses incurred in connection with the return of the Aircraft and other Items of Equipment in accordance with the terms of Article 17 or in placing any Aircraft and other Item of Equipment in the condition and airworthiness required by such Article and (b) any other reasonable costs and expenses that Boeing may incur in connection with the retaking, holding, storing, insuring, preparing for sale, lease or other disposition, selling, leasing or otherwise disposing of any Item and other like action.

Except as otherwise expressly provided above, no remedy referred to in this Article 19 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Boeing at law or in equity, and the exercise or beginning of exercise by Boeing of any one or more of such remedies shall not preclude the

LCF Operator Service

simultaneous or later exercise by Boeing of any or all such other remedies. No express or implied waiver by Boeing of, and no course of dealing by Boeing with respect to, any Event of Default shall in any way be or be construed to be, a waiver of any future or subsequent Event of Default. To the extent permitted by applicable law, Operator hereby waives any rights now or hereafter conferred by statute or otherwise which may require Boeing to sell, lease or otherwise use the Airframe or any Engine or part thereof in mitigation of Boeing's damages as set forth in this Article 19 or which may otherwise limit or modify any of Boeing's rights or remedies under this Article 19. Operator hereby irrevocably appoints Boeing the true and lawful attorney of Operator (with full power of substitution) in the name, place and stead of, and at the expense of, Operator in connection with the enforcement of the rights and remedies provided for in this Article 19 to give any necessary receipts or release for amounts collected or received hereunder; to make all necessary transfers of any of Boeing's interest in the, Airframe, Engines, Parts or part thereof in connection with any sale, lease or other disposition made pursuant hereto; to execute and deliver all necessary or appropriate bills of sale, assignments and other instruments in connection with any such sale, lease or other disposition, Operator hereby ratifying and confirming all that such attorney (or any substitute) shall lawfully do hereunder and pursuant hereto; and to terminate any pooling agreement, sublease or other agreement of Operator pursuant to which any Item of Equipment, Engine or Part may then be possessed by a Person other than Operator. The foregoing irrevocable power of attorney has been granted for valuable consideration and is coupled with an interest. In addition to the power of attorney granted herein, Operator separately has executed and delivered to Boeing the Power of Attorney. Nevertheless, if so requested by Boeing or a purchaser, Operator or other transferee, Operator shall ratify and confirm any such sale, lease or other disposition by promptly executing and delivering to Boeing or such purchaser, Operator or transferee all proper bills of sale, assignments, releases, leases and other instruments as may be designated in any such request. Any recoveries by Boeing, whether pursuant to the exercise of any remedy hereunder or otherwise, may be applied by Boeing in reduction of the obligations of Operator in such order as Boeing shall determine in its sole discretion.

## ARTICLE 20.  TERMINATION FOR CONVENIENCE

In accordance with Article 17 of Exhibit G of the Contract, Boeing, in its sole discretion, may terminate for convenience the Contract and any portion thereof.

## ARTICLE 21.  MAINTENANCE REIMBURSEMENTS

21.01  <u>Maintenance Reimbursements</u>.  Operator shall be responsible for all maintenance of the LCF, LCL, LCF Tail Stands and Other Items of Equipment as set forth in the SOW and the Operator's Maintenance Program.  Operator shall pay the costs associated with all maintenance associated with such maintenance. Boeing shall reimburse Operator for the maintenance costs incurred by Operator as follows:

(a)  Maintenance Costs included in Block Hour Rate:  Operator shall include in the Block Hour Rate set forth in Exhibit A – Pricing Exhibit, all maintenance costs except for those maintenance costs identified in Article 21(b) below..

(b)  Maintenance Costs invoiced separately:  In accordance with Exhibit A – Pricing

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

theretofore been paid by Operator and that no Boeing contributions had previously been made with respect to the maintenance related to such invoices.

(d)    REIMBURSEMENT SHALL BE LIMITED TO THE CHARGES AGREED TO HEREIN.

(e)    Invoices must be delivered to Boeing not more than one hundred eighty (180) days after the completion of the work to which such invoice respectively relates, shall not contain billing for more than one Item, and shall contain or be accompanied by the following substantiating data or reasonable equivalent (to the extent such data is applicable):

> (i)     work scope (routine, non-routine and materials);
> (ii)    vendor repair and overhaul instructions;
> (iii)   engine removal message and report;
> (iv)    vendor invoice and billing summary;
> (v)     customer engine information;
> (vi)    list of Airworthiness Directives and service bulletins accomplished during maintenance visit;
> (vii)   insurance claims submitted;
> (viii)  date of removal;
> (ix)    reason for removal;
> (x)     Hours and Cycles since last shop visit;
> (xi)    FAA Form 337 (or its equivalent);
> (xii)   vendor tear down report;
> (xiii)  current disk sheet or current list of LLP's installed; and
> (xiv)   total Flight Hours and Cycles since new.

(f)    Boeing payments will not be made for labor at premium rates, Airworthiness Directives, service bulletins, any repair or overhaul caused by foreign object damage, mishandling, faulty maintenance, improper operation, negligence, abuse, proper or improper modification or alteration, any claim which is subject to warranty rights or insurance or any claim which is found to be unreasonable as determined by Boeing in good faith.

21.03.A  Request for Early Maintenance. Boeing, for its convenience, reserves the right to require Operator to perform the Maintenance checks referenced in Article 21 prior to the expiration of the calendar time, cycles or hours that would ordinarily be used before the performance of such maintenance.

21.04  Maintenance Reimbursements and Operator Default. Any amount referred to in this Article 21 which is payable to Operator shall not be paid to Operator if at the time of such payment a Default or Event of Default shall have occurred and be continuing. In such event, all such amounts shall continue to be held by Boeing, as security for the performance by Operator of its obligations under this Contract, or at Boeing's option, applied toward payment of any of such obligations of Operator at the time due hereunder as Boeing may elect. At such time as Operator shall have cured all Defaults or Events of Default, Boeing contributions shall be paid to Operator if then payable in accordance with the terms of this Article 21.

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

21.05  Responsibilities of Operator, Boeing.  Except as provided in this Article 21, and Exhibit A – Pricing Exhibit, nothing herein shall be deemed to impose on Boeing any other obligation to pay for or be responsible for the payment of maintenance, refurbishment or overhaul of any Item of Equipment.

21.06  Airworthiness Directives  Airworthiness Directives issued by the FAA pursuant to FAR Part 39 (each, a Contract AD) prior to or during the Term and which require performance during the Term or within eighteen (18) months thereafter will be performed by Operator.  Operator will consult with Boeing regarding the method of accomplishment. Provided that (i) no Default or Event of Default exists (ii) the Contract AD has been performed in a manner satisfactory to Boeing and (iii) Operator has paid all vendors for the performance of the Contract AD, Boeing will reimburse Operator upon invoice for Operator's cost to accomplish the Contract AD.

## ARTICLE 22.  RESERVED

## ARTICLE 23.  CHARACTERIZATION OF THE CONTRACT

23.01  Intent of Parties.  It is the intent of the parties that Boeing shall at all times be considered the owner of the Items of Equipment for all purposes, including without limitation for purposes of all taxes measured by net income, and that this Contract conveys no right, title or interest in the Items to Operator, except as Operatora user thereof pursuant to the terms of this Contract.

23.02  Tax Assumptions.  Boeing and Operator acknowledge that this Contract has been entered into on the following assumptions (the "Tax Assumptions") for all tax purposes only: the Contract will be treated as a "true lease" and Boeing shall be the owner of each Item of Equipment for tax purposes.  Such Tax Assumptions are hereinafter referred to as the "Tax Benefits".

23.03  Tax Representations.  Operator hereby represents, warrants and covenants that neither Operator nor any Person controlled by it, in control of it, or under common control with it, directly or indirectly, will at any time take any action or file any return or other document inconsistent with the Tax Assumptions set forth above and each of such Persons will file such returns, take such actions and execute such documents as may be reasonable and necessary to facilitate accomplishment of the intent hereof.

23.04  Tax Indemnity.  If for any taxable year of Boeing during which the Contract is in effect, Boeing shall lose (upon audit, by being unable to claim or delayed in claiming, through recapture, or by not getting the benefit of, or otherwise) all or any portion of any of the Tax Benefits as a result of any misrepresentation by Operator or any person comprising Operator, Operator shall indemnify, and pay to Boeing an amount that, after taking into account any Taxes imposed on the receipt of any amount payable under this Article 23, will make Boeing whole from the loss of such Tax Benefits.

23.05  Definitions.  For purposes of this Article 23 only, the term "Boeing" shall mean

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

and include the affiliated group of corporations and each member thereof, of which Boeing is a member. In the event Boeing is a partnership or trust, the term "Boeing" shall also include the members of such partnership or beneficiaries of such trust and the affiliated group of corporations and each member thereof, of which such partner or beneficiary is a member.

23.06  Operator Reporting Requirements.  Operator agrees promptly to provide Boeing with sufficient information as is requested by Boeing and may be reasonably necessary to allow Boeing properly to determine the extent to which any tax items (including, without limitation, items of income, gain, loss, deduction or credit) attributable to this Contract should be apportioned or allocated to sources without the United States within the meaning of Sections 861 through 863 of the Code or is otherwise reasonably necessary for Boeing properly to file any return or report required in connection with this Contract.

**ARTICLE 24.  MISCELLANEOUS**

24.01  Construction.

(a)     No term or provision of the Contract may be changed, waived, discharged or terminated orally, but only by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.

(b)     Nothing herein shall be construed as conveying to Operator any right, title or interest in any Item of Equipment, except as authorized user.

(c)     The captions in the Contract are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

(d)     The Contract shall be effective for all purposes as of the date first above written.

24.02  Notices.  All notices provided for herein shall be in writing and shall be deemed to have been given if sent in accordance with the Notices provision contained in Exhibit G of the Contract.

24.03  RESERVED

24.04  Counterparts.  The Contract may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

24.05  RESERVED

24.06  RESERVED

24.07  RESERVED

24.08  Survival.   In addition to the survival provisions set forth in Exhibit G of the

LCF Operator Service

SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT

Contract, the representations, warranties, and agreements of Operator provided for in this Exhibit D, and Operator's obligations under any and all provisions of the Contract, shall survive the expiration or other termination of this Contract to the extent required for full performance and satisfaction hereof. All of the obligations of Operator under Articles 11 and 23 hereof shall continue in full force and effect notwithstanding the expiration or earlier termination of this Contract and are expressly made for the benefit of, and shall be enforceable by Boeing, and its successors and assigns. The indemnity obligations contained in Article 14 hereof and in Exhibit G shall continue in full force and effect notwithstanding the assignment, expiration or other termination of this Contract.

24.09  RESERVED

24.10  Currency. Operator and Boeing hereby agree the payment obligations set forth in the Contract will be paid in U.S. Dollars and in immediately available funds strictly in accordance with the terms and provision of the Contract. The payment obligations of Operator (the "payor") payable under this Contract expressed to be payable thereunder in one currency (the "first currency") shall not be discharged by an amount paid in another currency (the "second currency"), whether pursuant to a judgment or otherwise, to the extent the amount so paid on prompt conversion to the first currency under normal banking procedures does not yield the full amount of the first currency due thereunder, and the payor shall indemnify the recipient of such payment (the "payee") against any such shortfall; and in the event that any payment by the payor, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of the first currency, the payee shall have a separate cause of action against the payor for the additional amount necessary to yield the amount due and owing to the payee.

24.11  Commercial Acts. Operator is subject to civil and commercial law with respect to its obligations under the Contract, and the execution, delivery and performance by Operator of this Contract constitute and will constitute private and commercial acts rather than public or governmental acts. Operator is a corporate entity with the legal capacity to sue and be sued. Neither Operator nor any of its property, whether or not held for its own account, has any immunity (sovereign or otherwise) from any suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise under the Laws of the state [or country] of Operator's incorporation or any state [or country] in which Operator conducts business or any other jurisdiction in respect of its obligations under this Contract. Operator hereby waives every immunity (sovereign or otherwise) to which it or any of its properties would otherwise be entitled from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) under the Laws of the state [or country] of Operator's incorporation or any state [or country] in which Operator conducts business or any other jurisdiction in respect of its obligations under this Contract. The waiver by Operator described in the immediately preceding sentence is the legal, valid and binding obligation of Operator.

24.12  RESERVED

LCF Operator Service

<center>SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT
EXHIBIT D
TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE
CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT</center>

24.13 <u>GOVERNING LAW</u>.   THIS CONTRACT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF WASHINGTON INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

24.14 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES AS AGAINST THE OTHER PARTY HERETO ANY RIGHTS IT MAY HAVE TO A JURY TRIAL IN THE UNITED STATES OF AMERICA IN RESPECT OF ANY CIVIL ACTION ARISING UNDER THIS AGREEMENT.

24.15 <u>Submission to Jurisdiction</u>. Each of Operator and Boeing hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any Washington State or federal court sitting in Seattle, Washington, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Contract and each of Operator and Boeing hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in Washington State or, to the extent permitted by law, in such federal court. Each of Operator and Boeing hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

24.16 <u>RESERVED</u>

24.17 <u>RESERVED</u>

24.18 <u>Entire Agreement</u>. This Contract constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and all prior or contemporaneous understandings or agreements, whether written or oral, among any of the parties hereto with respect to such subject matter are hereby superceded in their entireties.

24.19 <u>Use of English Language</u>. Each of the Parties hereby acknowledges and confirms that the English language version of this Contract shall be the governing version upon which all the Parties hereto shall rely.

<center>*     *     *</center>

LCF Operator Service

**SHARED SERVICES GROUP SUPPLIER MANAGEMENT & PROCUREMENT**
**EXHIBIT D**
**TERMS AND CONDITIONS RELATING TO THE USE OF LARGE CARGO FREIGHTERS, LARGE CARGO LOADERS, LARGE CARGO FREIGHTER TAIL STANDS AND OTHER ITEMS OF EQUIPMENT**

<u>ATTACHMENT 1A</u>

DELIVERY AND TECHNICAL ACCEPTANCE
[TO BE SUPPLEMENTED BY A DETAILED TECHNICAL REPORT AND INVENTORY
INCLUDING PHOTOGRAPHS OF CONDITIONS AND CONFIGURATION]

THIS DELIVERY AND TECHNICAL ACCEPTANCE, dated as of _____,
20__, between _____ ("<u>Boeing</u>") and
_____ ("<u>Operator</u>");

W I T N E S S E T H

WHEREAS, Boeing and Operator have heretofore entered into that certain _____
Agreement dated as of _____, 200_ (herein called the "<u>Contract</u>" and the
terms defined therein being herein used with the same meaning), which Contract
provides for the execution and delivery of a Delivery and Technical Acceptance
substantially in the form hereof for the purpose of Boeing furnishing the Aircraft to
Operator under the Contract as and when delivered by Boeing to Operator in
accordance with the terms thereof;

NOW, THEREFORE, in consideration of the premises and other good and sufficient
consideration, and pursuant to Article 2 of the LCF-LCL Terms , Boeing and Operator
hereby agree as follows:

1.      On the date first set forth hereinabove at ___:___ [AM/PM] at
_____ [Location—use full street address if in U.S.] Boeing hereby
delivers and furnishes to Operator, and Operator hereby accepts, takes possession of,
and agrees to use in accordance with the Contract as herein supplemented, the
following:

(i)      Airframe: One [new/used] _____ Model _____ aircraft bearing
manufacturer's serial number _____ and _____ registration [number/mark]
_____.

(ii)     Engines: _____ (____) [new/used] _____ Model _____
engines bearing manufacturer's serial numbers _____ and _____, each of which
Engines has 750 or more rated takeoff horsepower or its equivalent.

(iii)    RESERVED

(iv)     All Aircraft Documentation, as listed in Annex I attached hereto.

(v)      The loose equipment listed in Annex II hereto.

A-1

(vi)    Such other further and additional equipment as may be specified in any other attachment hereto.

All the foregoing is hereinafter referred to as the "Delivered Equipment".  The Delivered Equipment has been accepted and delivered to Operator on the date set forth above to Operator's full satisfaction pursuant to the terms and provisions of the Contract.

2.    The Delivery Date of the Delivered Equipment is the date of this Delivery and Technical Acceptance set forth in the opening paragraph hereof.

3.    The Term for the Delivered Equipment shall commence on the Delivery Date therefor and shall continue to exist until the close of business on the day prior to the [_____insert___ ] anniversary date of the Delivery Date (the "Contract Termination Date").

4.    Operator hereby confirms its agreement to pay Boeing Supplemental Payments in accordance with the Contract.

All Supplemental Payments and other amounts due under the Contract shall be paid to Boeing by wire transfer of same day funds, without deduction for bank transaction or wire transfer fees, on or before the due dates therefor to the account of _____, ABA No. _____, Account No. _____, Reference: _____.

5.    The Airframe, Engines, Landing Gear and Parts had the hours and cycles at Delivery set forth on Annex III hereto.

6.    Operator hereby confirms that the Stipulated Loss Value for the Aircraft is ███████████.

7.    RESERVED.

8.    Operator hereby confirms to Boeing that it will, as soon as practicable, mark the Delivered Equipment as showing all interests thereto in accordance with the terms of the Contract.  Operator confirms it has accepted the Delivered Equipment for all purposes hereof and of the Contract, including its being airworthy, in accordance with specifications, in good working order and repair and without defect in title, condition, design, operation or fitness for use, whether or not discoverable by Operator on the date hereof, and free and clear of all Liens, except for those contemplated by the Contract, provided, however, that nothing contained herein or in the Contract shall in any way diminish or otherwise affect any right Operator or Boeing may have with respect to the Delivered Equipment against the manufacturer thereof, or any subcontractor or supplier of the manufacturer thereof.  Operator confirms the Delivered Equipment is in the condition set forth in Annexes I, II and III attached hereto.

9.    This Delivery and Technical Acceptance, together with the Contract, constitutes the entire agreement of the parties with respect to the subject matter hereof, and all prior or contemporaneous understandings or agreements (other than the Contract), whether written or oral, with respect to such subject matter are hereby superceded in their entirety.

A-2

10.     THIS DELIVERY AND TECHNICAL ACCEPTANCE SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF WASHINGTON INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

*   *   *

IN WITNESS WHEREOF, Boeing and Operator have each caused this Delivery and Technical Acceptance to be duly executed by their authorized officers as of the day and year first above written.

The Boeing Company

_____

By: _____

Its: _____

Evergreen International Airlines, Inc.

_____

By: _____

Its: _____

A- 3

Annex I to Delivery and Technical Acceptance

Aircraft Documentation

{To be provided by Boeing Technical Rep at closing}

A- 4

<u>Annex II to Delivery and Technical Acceptance</u>

Loose Load List

{To be provided by BoeingTechnical Rep at closing}

A- 1

<u>Annex III to Delivery and Technical Acceptance</u>

{Information to be provided by BCC Technical Rep/ Operator at closing}

Flight Hours and Cycles

One (1) (new/used) _____ Model _____ Airframe bearing Manufacturer's
Serial No. _____

| Total Time (Flight Hours) | Total Cycles |
|---|---|
| _____ | _____ |

FUEL ON BOARD:      _____ (pounds/kilos)

TEST FLIGHT HOURS/CYCLES:   ___ / __(Test flight time & Cycles are <u>not</u> included in
the times and cycles referenced on this sheet)

<u>Engines</u>

_____ Model _____

Position #1:  MSN _____
Position #2:  MSN _____
Position #3:  MSN _____
Position #4:  MSN _____

| Serial Number | Total Time (Flight Hours) | Total Engine Cycles | Cycles Remaining to Next Replacement Of Lowest L.L. Part | Time Since Last Shop Visit |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

Engines are delivered oil service full.

Annex III Page-1

**Landing Gears**

|  | Serial Number | Cycles | Total Hours/Cycles Since Last Overhaul | Cycles to Next Overhaul |
|---|---|---|---|---|
| Nose Landing Gear | _____ | _____ | _____ | _____ |
| Left Main Gear | _____ | _____ | _____ | _____ |
| Right Main Gear | _____ | _____ | _____ | _____ |
| Center Main Gear | _____ | _____ | _____ | _____ |

**Maintenance Program**

Annex III Page-2

<u>ATTACHMENT 1B</u>

LCL/Tail Stand Delivery Receipt

THIS LCL/Tail Stand Delivery Receipt, dated as of _____, 20__, between
_____ ("<u>Boeing</u>") and _____
("<u>Operator</u>");

## W I T N E S S E T H

WHEREAS, Boeing and Operator have heretofore entered into that certain _____ Agreement dated as of _____, 200_ (herein called the "<u>Contract</u>" and the terms defined therein being herein used with the same meaning), which Contract provides for the execution and delivery of a LCL/Tail Stand Delivery Receipt substantially in the form hereof for the purpose of Boeing furnishing  the [LCL,Tail Stand, or other Item of Equipment] to Operator under the Contract as and when delivered by Boeing to Operator in accordance with the terms thereof;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, and pursuant to Article 2 of the LCF-LCL Terms, Boeing and Operator hereby agree as follows:

1.      On the date first set forth hereinabove at ___:___ [AM/PM] at
_____ [Location—use full street address if in U.S.] Boeing hereby delivers and furnishes to Operator, and Operator hereby accepts, takes possession of, and agrees to use in accordance with the Contract  as herein supplemented, the following:

(i)      LCL  [list serial number or other itendifying marks]

(ii)     Tail Stand  [list serial number or other identifying mark]

(iii)    Documentation  relating to the Items of Equipment listed above.

(iv)    Such other further and additional equipment as may be specified in any other attachment hereto.

All the foregoing is hereinafter referred to as the "<u>Delivered Equipment</u>".  The Delivered Equipment has been accepted and delivered to Operator on the date set forth above to Operator's full satisfaction pursuant to the terms and provisions of the Contract.

B-1

2.      The Delivery Date of the Delivered Equipment is the date of this Delivery and Technical Acceptance set forth in the opening paragraph hereof.

3.      The Term for the Delivered Equipment shall commence on the Delivery Date therefor and shall continue to exist until the close of business on the day prior to the _____insert___ anniversary date of the Delivery Date (the "Contract Termination Date").

4.      Operator hereby confirms that the Agreed Value for the LCL  is $_____and the Agreed Value for the Tail Stand is $_____.

5.      THIS LCL/TAIL STAND DELIVERY RECEIPT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF WASHINGTON INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

                              *   *   *

B-2

IN WITNESS WHEREOF, Boeing and Operator have each caused this LCL/Tail Stand Delivery Receipt to be duly executed by their authorized officers as of the day and year first above written.

The Boeing Company

_____

By:   _____

Its:   _____

Evergreen International Airlines, Inc.

_____

By:   _____

Its:   _____

B-3

ATTACHMENT 1C                    Report to be directed to:
[insert appropriate address]
Monthly Report

REPORT FOR CALENDAR MONTH ENDED: _____
CUSTOMER: _____
AIRCRAFT TYPE: _____
**MANUFACTURER SERIAL NUMBER:** _____
REGISTRATION NUMBER: _____

| **AIRFRAME** | During Period | | Total |
|---|---|---|---|
| | Within US | Outside US | |
| Airframe Flight Hours: | | | |
| Airframe cycles: | | | |
| Airframe Miles Flown: | | | |

| <u>LANDING GEAR</u> | Main | Central | Front |
|---|---|---|---|
| MSN | | | |
| Cycles during period | | | |
| Total cycles | | | |

| <u>ENGINES</u> | Position #1 | Position #2 | Position #3 | Position #4 |
|---|---|---|---|---|
| MSN  of original engine: | | | | |
| Present location of original engine: | | | | |
| Total Flight hours: | | | | |
| Total Cycles: | | | | |
| Flight hours during period: | | | | |
| Cycles during period: | | | | |
| Serial number of installed engine: | | | | |

ATTACHMENT 1D

FORM OF EUROCONTROL LETTER

_____, _____

Director Central Route Charges Office

Re: EUROCONTROL Statements of Account

Dear Sir,

I hereby confirm that _____ (the "Operator") has entered into a _____ Agreement dated as of _____, 20\_\_ (as amended, modified and supplemented from time to time, the "Agreement") between_____ ("Boeing") and Operator with respect to one \_\_\_\_\_ model \_\_\_\_\_ aircraft, bearing manufacturer's serial numbers _____ and _____ registration [number/ mark] _____ (the "Aircraft").

I hereby irrevocably authorize EUROCONTROL to issue to Boeing upon Boeing's request from time to time, a statement of account of all sums due by Operator to EUROCONTROL in respect of the aircraft in its fleet and, in particular, the Aircraft, as at the date of each such request from Boeing.

Very truly yours,

By: _____
Name:
Title:

D-1

**ATTACHMENT 1E**

**Reserved**

E-1

<u>ATTACHMENT 1F</u>

Form of Re-Delivery Certificate

RE-DELIVERY CERTIFICATE

**Date:** _____

1.      _____ ("Operator") and _____ ("Boeing") have entered into an _____ Agreement dated as of _____, 200_ (the "Contract").  Words used herein with capital letters and not otherwise defined will have the meanings set forth in the Contract.

2.      Boeing has this ___ day of _____, _____ (Time: _____) at _____ received from Operator possession of:

  (i)      Airframe:  One [new/used] _____ Model _____ aircraft bearing manufacturer's serial number _____ and _____ registration [number/mark] _____.

  (ii)      Engines:  _____ (____) [new/used] _____ Model _____ engines bearing manufacturer's serial numbers _____ and _____.

  (iii)      RESERVED

  (iv)      All Aircraft Documentation, as listed in Annex I attached hereto.

  (v)      The loose equipment listed in Annex II hereto.

  (vi)      Such other further and additional equipment as may be specified in any other attachment hereto.

The Re-Delivered Equipment had the following Flight Hours/Cycles at return:

Flight Hours and Cycles

One (1) _____ Model _____ Airframe bearing Manufacturer's Serial No. _____

| Total Time (Flight Hours) | Total Cycles |
|---|---|
| _____ | _____ |

F-1

FUEL ON BOARD:        _____   (pounds/kilos)

TEST FLIGHT HOURS/CYCLES:  ___ / __(Test flight time & Cycles are not included in the times and cycles referenced on this sheet)

## Engines

_____ Model _____

Position #1:  MSN _____
Position #2:  MSN _____
Position #3:  MSN _____
Position #4:  MSN _____

| Serial Number | Total Time (Flight Hours) | Total Engine Cycles | Cycles Remaining to Next Replacement Of Lowest L.L. Part | Time Since Last Shop Visit |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| | | | | |
| | | | | |

Engines are delivered oil service full.

## Landing Gears

| | Serial Number | Cycles | Total Hours/Cycles Since Last Overhaul | Cycles to Next Overhaul |
|---|---|---|---|---|
| Nose Landing Gear | _____ | _____ | _____ | _____ |
| Left Main Gear | _____ | _____ | _____ | _____ |
| Right Main Gear | _____ | _____ | _____ | _____ |
| Central Main Gear | _____ | _____ | _____ | _____ |

## Maintenance Program

| A Check | Check | Accomplish Engine Performance | |
|---|---|---|---|

F-2

| | | Restoration Shop Visit | |
|---|---|---|---|
| Interval | ———— | ———— | ———— | ———— |

4.      Operator represents and warrants that the other technical information regarding the Aircraft and its components are correctly set forth in the completed Technical Evaluation Report (in the form of Attachment G to the LCF-LCL Terms) attached hereto.

5.      The above specified aircraft, engines and documentation have been delivered by Operator to and are hereby accepted by Boeing [in/at] _____ [location—use full street address if in U.S.] subject to (a) the provisions of the LCF-LCL Terms and (b) correction by Operator (or procurement by Operator at Operator's cost) as soon as reasonably possible of the discrepancies specified in Annex III hereto.

6.      Operator represents and warrants that during the Term all maintenance and repairs to the Airframe, Engines and other Items of Equipment were performed in accordance with the requirements contained in the Contract.  Operator further confirms that all of its obligations under the Contract whether accruing prior to the date hereof or which survive the termination of the Contract by their terms and accrue after the date hereof, will remain in full force and effect until all such obligations have been satisfactorily completed.  Operator represents and warrants that there have been no accidents or incidents involving any Item of Equipment which have not been entered in the logbooks or other records provided to Boeing.

7.              Operator has delivered to Boeing current certificates of insurance evidencing the coverages required by Section 13.01 of the Contract.

8.      This Re-Delivery Certificate shall be governed by and construed in accordance with the laws of the State of Washington.

IN WITNESS WHEREOF, the parties hereto have caused this Re-Delivery Certificate to be executed in their respective corporate names by their duly authorized representatives as of the day and year first above written.

The Boeing Company                          Evergreen International Airlines, Inc.
_____                  _____

By: _____          By: _____

Its: _____          Its: _____

F-3

F-4

<u>ANNEX I TO RE-DELIVERY CERTIFICATE</u>

<u>Aircraft Documentation</u>

1.  Current Certificate of Airworthiness (C of A).
2.  Current registration Certificate.
3.  Current, or last Export Certificate of Airworthiness.
4.  Certificate of Sanitary Construction for galleys and lavatories, as applicable.
5.  Aircraft description and status summary.
6.  All historical records for Airframe and Engines.
7.  Airframe and Engines current inspection status and operating times including structural sampling inspection records of inspections performed on other of Operator's aircraft where credits for such inspections were applied against the aircraft.
8.  RESERVED
9.  List and status of time and cycle controlled components – Airframe, Engines, landing gear and accessories.
10. List and status of time and cycle controlled LLP's – Airframe, Engines, and landing gear.
11. List of all installed components (LRU's) showing part number, serial number, manufacturer, avionics modification levels, and accumulated time and cycles.
12. Summary and status of FAA Airworthiness Directives – including Engines, and equipment, and the method of accomplishment (i.e., repetitive inspections, interim fix, or terminating action).
13. List of manufacturer's Service Bulletins incorporated and the method of accomplishment (i.e., repetitive inspections, interim fix, or terminating action) for Airframe, Engines and equipment. Where only a portion of a service bulletin is accomplished, Operator will so identify which portion was accomplished.
14. List of Operator-initiated modifications and/or alterations accomplished on the Aircraft, Engines, and equipment together with one copy of each modification, alteration, engineering order, FAA Form 8110-3 approval, and associated drawings, manuals, and/or data.
15. List of incorporated FAA Supplemental Type Certificates (STC's) together with a copy of each certificate, list of drawings, manuals, and/or associated data.
16. List of maintenance "watch items" (including any system or structural defects and special condition repetitive inspection requirements).
17. List of special, non-SRM or non-MM repairs accomplished to the Airframe, Engines and landing gear together with one copy of each such repair, engineering order, FAA Form 8110-3 approval, and associated drawings and/or data.
18. List of non-United States manufactured parts, components and/or equipment installed on the Aircraft after the date such Aircraft was delivered new by the Aircraft manufacturer to the initial owner which parts, components, or equipment have not been approved or certified by the FAA.
19. Inventory list of Aircraft loose equipment (to include all galley equipment, flight deck and passenger cabin emergency equipment, cargo compartment removable cargo stops and restraint nets).
20. Current interior arrangement diagram (LOPA)
21. Current emergency equipment installation drawing /diagram.
22. FAA 8130-3 Forms or airline Part tags, and shop overhaul reports for all time and Cycle controlled components – Airframe, Engines, landing gear and accessories – changed

since original aircraft delivery from Aircraft Manufacturer.

23. FAA 8130-3 Forms or Airline Part tags for all time and cycle controlled Life Limited Parts – Airframe, Engines,  and landing gear – changed since original aircraft delivery from Aircraft Manufacturer.

24. Burn Certification Test Data and/or FAA 8130-3 forms for cabin interior materials replaced since original Aircraft delivery from Aircraft Manufacturer (to include materials used for all interior seating, curtains, partitions, sidewalls, and carpets).

25. Record of last compass swing.

26. List of oils and fluids used for Aircraft Engines,  and Airframe systems.

27. Aircraft flight log books.

28. Aircraft maintenance / readiness log books.

29. Aircraft cabin log books.

30. All FAA Form 337's, Major repair and alterations.

31. All repair records, Major and Class 1, 2, 3.

32. Corrosion Prevention Control Program (CPCP) summary, and compliance documents.

33. Aging Aircraft program summary, and compliance documents.

34. Last aircraft weight and balance report.

35. Last aircraft flight control surfaces weight and balance reports.

36. All records initiated by Operator to comply with Aviation Authority requirements, and/or initiated by Operator for Operator's own benefit.

37. All Engines' trend monitoring program documents.

38. Last accomplished Digital Flight Data Recorder (DFDR) calibration and algorithms report.

39. Acceptance flight reports – last flight accomplished prior to re-delivery.

40. Scheduled maintenance check status.

41. Quality Control Department Statements:

42. Maintenance Program Certification or Approval.

43. Letter detailing any major incident and/or accidents involving the Aircraft (if none, the letter should so state).

44. Letter detailing and leased or loaned parts that are installed on the Aircraft (if none, the letter should so state).

45. Letter certifying time/Cycles on Airframe, Engines, LLP's, time controlled items, hard time items, landing gear,  etc.

46. List of supporting Repair Stations/Approved vendors (if available).

47. List of equipment to be removed prior to Contract return delivery.

48. In-service activities report.

49. Significant Service Item summary.

50. Service Letters Index and Service Letters / All Operators Letters (AOLs)

51. Miscellaneous documents or manuals pertaining to Aircraft storage, Engine handling, aircraft recovery, and ground crew training (if available).

52. Maintenance planning document (MPD).

53. Operator's Operation Specification document / General Maintenance Manual document (will be used by Boeing only as reference material).

54. Maintenance program task work cards (will be used by Boeing only as reference material).

55. Operator's Maintenance Program tasks-to-Maintenance Review Board (MRB) tasks cross-reference list.

56. Scheduled Maintenance Program requirements summary.

57. Aircraft parts two-way cross-reference list: Airline/Manufacturer part numbers.

58. Original Aircraft Manufacturer's packing list.
59. Configuration, Maintenance and Procedures for Extended Range Operations.
60. ETOPS Guides.
61. Cockpit drawing.
62. FAA approved Airplane Flight Manual (AFM).
63. Operations Manual / Quick Reference Handbook (QRH).
64. Flight Crew Training Manuals / Flight Crew Operating Manuals (FCOMS).
65. Dispatch Deviation Procedures Guide.
66. Minimum Equipment List (MEL), Master Minimum Equipment List (MMEL), Configuration
    Destination List (CDL).
67. MEL Procedures Manual.
68. Fault Isolation Manuals.
69. Fault Reporting Manual.
70. Ramp Maintenance Manuals.
71. Manufacturer's Maintenance Manuals – Airframe and Engines.
72. Manufacturer's Illustrated Parts Catalogs (IPC) – Airframe and Engines.
73. Manufacturer's Structural Repair Manuals (SRM).
74. Manufacturer's Component Maintenance Manuals (CMM) – Airframe and Engines.
75. Manufacturer's Overhaul Manuals (OHM) – Airframe and Engines.
76. Powerplant Build-up Manuals.
77. Engine Ground Handling Document.
78. Non-Destructive Testing Manuals (NDTM).
79. Corrosion Prevention Manual (CPM).
80. System Test Equipment Manual.
81. Wiring Diagram Manual, including wiring diagram equipment lists.
82. System Schematic Manuals.
83. Aircraft Weight and Balance Manual.
84. Aircraft Weight and Balance Supplement – Equipment list.
85. Bite Manual.
86. Service Bulletin Index and Service Bulletins.
87. Airplane Recovery Document.
88. Fuel Measuring Stick Calibration Document.
89. Non-proprietary Vendor Maintenance Manuals, and Component Maintenance Manuals
    for specialized equipment (i.e., galleys, lavatories, flight crew seating, passenger
    seating, video systems, passenger entertainment, etc.).
90. Special Tool and Ground Handling Equipment Index.
91. Illustrated Tool and Equipment Catalog.
92. Facilities Planning Document.
93. Operator's statement of no accidents or incidents.

Annex I-Page 3

ATTACHMENT 1G

FORM OF TECHNICAL REPORT

[TBD]

G-1

SCHEDULE 1

<u>REQUIRED APPROVALS</u>

SCH 1 page 1

<u>SCHEDULE 2</u>

<u>AIRCRAFT RETURN CONDITIONS</u>

1.    <u>Return</u>.  Except as otherwise provided herein, at the expiration of the Term for the Aircraft or upon the sooner termination of this Agreement, Operator, at its own expense, shall return the Aircraft to Boeing by delivering the same to Boeing at a location designated by Boeing.  The Aircraft, at the time of return to Boeing, shall be in the same configuration as on the Delivery Date, unless otherwise mutually agreed in writing between the parties hereto, fully equipped, subject to the terms hereof, the Engines installed thereon, with all Parts and with all other equipment as when delivered to Operator. Operator shall not be relieved of any of its duties, obligations, covenants or agreements under this Agreement  prior to the return of the Aircraft in the manner and condition required with respect to such return.  The Aircraft, upon redelivery pursuant hereto, (a) shall be free and clear of all Liens (b) shall be in the same operating condition, ordinary wear and tear excepted, as when delivered to Operator hereunder and (c) shall satisfy all the conditions set forth in Article 17 of the LCF-LCL Terms.

2.    <u>Replaced Engines</u>.  In the event any engine not owned by Boeing shall be returned with the Airframe in lieu of an Engine:  (a) if the reason therefor is other than that an Event of Loss has occurred to such Engine, such engine shall be satisfactory to Boeing, in its reasonable discretion, free and clear of Liens, suitable for use on the Airframe and shall have a value and utility at least equal to, and be in as good operating condition, including the incorporation of all Airworthiness Directives and alert service bulletins which Operator is required to effect under this Agreement, and with no greater number of accumulated Flight Hours or Cycles since the last heavy shop visit on such engine, as the Engine that should have been returned, assuming such Engine which should have been returned was in the condition and repair as required by the terms hereof immediately prior to such required return; and (b) if the reason therefor is that an Event of Loss has occurred to such Engine, such engine shall be free and clear of Liens, suitable for use on the Airframe and shall have a value, in Boeing's reasonable discretion, and utility at least equal to, and be in as good operating condition, including the incorporation of all Airworthiness Directives and alert service bulletins which Operator is required to effect under this Agreement, as the Engine that should have been returned, assuming such Engine which should have been returned was in the condition and repair as required by the terms hereof immediately prior to such required return; and, in either case, Operator shall, at its own expense and concurrently with such delivery, furnish Boeing with a bill of sale, in form and substance reasonably satisfactory to Boeing, of each such engine and with evidence of Operator's title to such engine (including, if requested, an opinion of Operator's counsel) and take such other action as Boeing may reasonably request in order that title to such engine shall be duly and properly vested in Boeing.  Upon full compliance with Article 17 of the Agreement and passage of title to such engine to Boeing, such engine shall be an "Engine" for all purposes of this Agreement and Boeing shall Transfer to Operator all Boeing's right, title and interest in any Engine so replaced.

3.    <u>Return of Aircraft Documentation</u>.  Upon the return of the Aircraft, Operator shall deliver to Boeing all updated logs, manuals, certificates and data, and inspection, modification and overhaul and repair records amended to their latest amendment revision pertaining to the Airframe, Engines or engines, components, assemblies and appliances, which are required to be maintained with respect thereto under applicable

rules and regulations of the FAA, the Aviation Authority and as described herein.  These shall include but not be limited to the items described in paragraph 7(f) of this Schedule 2.  Operator shall deliver to Boeing the current and, to the extent necessary to understand the Aircraft Documentation, complete Maintenance Program for the airframe, engines, parts, etc., including all software, reliability programs and software, general maintenance manual, and other items necessary for a complete maintenance program.

4.      Special Markings.  Prior to the return of the Aircraft, Operator shall, at Operator's cost, remove from the interior and the exterior of the Aircraft all insignias and other distinctive markings of Operator and completely strip and repaint the Airframe exterior all-white or in a livery designated by Boeing in a workmanlike manner.

5.      Maintenance Program.  Prior to the return of the Aircraft, Operator shall provide Boeing with a true and complete copy of the Maintenance Program.

6.      Modification Kits.  Boeing may request and Operator shall provide any modification kits or other such items that are on order for the Aircraft and Boeing shall reimburse Operator for the cost of such kits.  Operator shall be responsible for ordering all no-charge kits, and if not incorporated, shall return them to Boeing with the Aircraft at no charge to Boeing.

7.      Maintenance Generally.  Upon return of the Aircraft to Boeing hereunder, at Operator's expense:

(a)     Certification.  The Aircraft shall have a current, valid and effective transport category certificate of airworthiness issued by the Aviation Authority or the FAA as appropriate and determined by Boeing, or if required by Boeing, an export certificate of airworthiness for export to another country as designated by Boeing, in which case the Aircraft will be deregistered from the country of registration at Operator's cost upon the return.  The Aircraft shall be immediately eligible for a valid and effective Standard Certificate of Airworthiness issued by the FAA, and shall be returned in compliance with the Maintenance Programs for Airframe, Engines, components, and assemblies, and shall be in full compliance with the provisions of Part 121 of the U.S. Federal Aviation Regulations and U.S. regulations applicable to the Aircraft's operations for noise, emissions and environment and be eligible for immediate registration and operation in the United States under the provisions of such Part 121 with no waivers or restrictions.

(b)     Overhaul and Repair.  The Engines,  Landing Gear and all Parts shall be documented with work orders, vendor serviceable tags, Form 8130's, FORM 337's, JAA Form 1's or equivalent FAA acceptable certificates and tags to have been repaired or overhauled by certified repair stations acceptable to the FAA and in such manner so that such Parts, Engines,  and Landing Gear are approved by the FAA for use on United States registered and certified aircraft.  All overhaul and repair procedures shall have met all requirements of the FAA, the Manufacturer, and the manufacturer of the applicable Item of Equipment for quality and documentation necessary to enable immediate transfer to a new operator under Part 121 of the U.S. Federal Aviation Regulations.

(c)     Repairs.  All repairs that were performed since the Aircraft delivery and that then exist on the Aircraft shall be permanent and conform to the Manuals and shall have FAA approval if required.  All repairs not covered by the Manuals shall be provided with

complete data and documentation to verify and substantiate their certification and methods of compliance.  Operator shall keep and maintain a complete summary listing of all repairs performed (with dirty fingerprint accomplishment records).

(d)      Modifications.  All modifications to the Aircraft shall be in accordance with FAA-approved data or be removed, at Boeing's discretion, with appropriate post-removal repairs to the Aircraft to be made by Operator.  All such modifications shall be provided with complete data and documentation to substantiate their certification, approval, and methods of compliance.  Operator shall provide to Boeing a complete summary listing of all modifications performed with substantiating documentation.

(e)      Airworthiness Directives and Mandatory Regulations.  All FAA and Aviation Authority Airworthiness Directives, U.S. Federal Aviation Regulations and manufacturer alert service bulletins applicable to the Aircraft (including its systems and components) requiring compliance or terminating compliance on or prior to the eighteen (18) month anniversary of the Contract Termination Date shall be fully accomplished in compliance with the issuing authority's specific instructions.  All FAA and Aviation Authority Airworthiness Directives, U.S. Federal Aviation Regulations and manufacturer alert service bulletins applicable to the Aircraft (including its systems and components) shall be accomplished without regard to any alternate means of compliance, waiver or operator exemptions delaying compliance with such FAA and Aviation Authority Airworthiness Directives or U.S. Federal Aviation Regulations or Manufacturer's alert service bulletins.  All FAA and Aviation Authority Airworthiness Directives, U.S. Federal Aviation Regulations and Manufacturer alert service bulletins applicable to the Aircraft (including its systems and components) which do not have a terminating action shall be accomplished at the highest level of inspection or modification possible.  Operator shall provide a current and accurate status report and all hard copy records evidencing when accomplished times and cycles, and method of accomplishment with the appropriate signatures or stamps (the dirty fingerprint accomplishment records).

(f)      Records.

    (i)      All records as required under this Section and all those necessary and required by the FAA and Aviation Authority to certify the Aircraft and place the Aircraft on an FAA approved maintenance program shall be delivered with the Aircraft.  Operator shall return to Boeing all hard copy records in an organized fashion.  In no event will Operator destroy or dispose of any hard copy records.  These records shall be all-inclusive for the Aircraft, Airframe, Engines, components, rotables, and assemblies, and at a minimum shall include all activities associated with each of the last completed maintenance checks, maintenance review board significant structural inspections (MRB SSI) sampling program, aging aircraft and corrosion control tasks, repairs, scheduled inspections and functional tests, and overhauls performed to the Maintenance Program, including tasks and compliance associated with noise and emissions requirements.

    (ii)      All Time Controlled Components and LLP's shall be provided with part number, serial number, their service histories, accumulated Cycles and Flight Hours, safe-life, life limits or hard time limits and remaining service lives on a separate listing, be physically verified as installed and have hard copy

SCH 2 page 3

documentation (i.e., appropriate vendor tags and work orders) to verify their service histories with complete "back to birth" traceability.

(iii)    All components and assemblies which are identified on the maintenance records by part numbers and/or serial numbers other than the manufacturer's shall be provided with two way or two way cross-reference listing necessary to establish complete traceability.

(iv)    All documentation, flight records, and maintenance records as specified by this Contract and as specified by the FAA and any other Aviation Authority shall be delivered to Boeing with the Aircraft.  In the event of missing or incomplete records, Operator shall accomplish the tasks necessary to produce such complete records in accordance with the Maintenance Program prior to return of the Aircraft.

(v)    All documentation and records summaries or lists shall be in English and shall be made available to Boeing for review, in a mutually agreed upon location allowing direct access to the Aircraft, at least thirty (30) Business Days before the date that the Aircraft is required to be returned to Boeing.

(vi)    Operator shall provide any and all documentation, data, drawings, records and manuals regardless whether Operator considers such information proprietary.

All documentation and records shall be signed by the head of Operator's quality control department certifying that the data and information contained therein is true and correct.  For any computerized records such head of quality control shall sign or initial each computer page.

(g)    Return Status.

(i)    The Aircraft shall be returned in the same operating order, repair and condition as originally delivered to Operator, ordinary wear and tear excepted, and shall have been maintained in a non-discriminatory manner with other similar Aircraft in Operator's fleet.  The Aircraft shall be returned in compliance with the Maintenance Program.

(ii)    Reserved

(iii)    Each Engine shall not have any condition which according to trend monitoring shows a higher than normal deterioration of the Engine or a condition which will result in a removal of the Engine prior to reaching its next anticipated complete Refurbishment based on the Average Refurbishment Interval.  Each Engine shall meet the maintenance manual criteria for part power and full power runs with a minimum EGT margin of 25 degrees C.  Each Engine shall have a complete video borescope inspection (cold section, hot section and combustors) performed by a provider selected by Boeing at Operator's expense and be satisfactorily completed immediately prior to return.  The Engines shall not be deemed to meet these return conditions if the borescope inspection reveals any watch items, unserviceable or reject conditions.  If the parameters of the Engine

SCH 2 page 4

inspection are not within the Engine Manufacturer's limits, Operator will be obligated to provide a replacement engine meeting the requirements of this subparagraph and of paragraph 2 of this Schedule 2 or have the Engine repaired to bring it within such limits.

(iv)  RESERVED

(v)     All other components, equipment, Landing Gear, LLP's (other than Engine LLP's), Time Controlled Components, appliances and other devices or units which are time, Cycle or calendar controlled normally in service during the operation of the Aircraft will be delivered in compliance with the Maintenance Program.

(h)     <u>Deferred Maintenance</u>.  There shall be no deferred maintenance items, scheduled or unscheduled, temporary repairs, watch items, or items requiring repetitive inspections against the Aircraft, including those identified in redelivery inspections or demonstration flights.

(i)     <u>Corrosion, Aging Aircraft, SSI and SDI</u>.  The Aircraft shall be in compliance with and Operator shall provide complete details of its Corrosion Prevention Control Programs, Aging Aircraft, Structural Significant Inspection ("<u>SSI</u>") and Special Detailed Inspection ("<u>SDI</u>") program. Operator shall also provide a complete summary of specific corrosion correction, aging aircraft, SSI and SDI inspections of the Aircraft in accordance with the Maintenance Program.  This summary shall include Operator's identifying the Manufacturers' task identifier and cross referencing Operator's identifier indicating status of accomplishment and findings and incorporation status relative to all recommended corrective and preventative actions.  To Operator's knowledge, but subject to Boeing's rights of inspection, there shall be no untreated or uncorrected corrosion remaining on the Aircraft, including within the fuel tanks.

(j)     <u>General Appearance</u>.  The Aircraft shall be clean, cosmetically acceptable and complete, shall function, perform and have been maintained in accordance with the Maintenance Program, and shall be in suitable condition to be immediately placed into U.S. scheduled revenue airline operations under Part 121 of the Federal Aviation Regulations without waiver or restriction.  This shall include but not be limited to the following:

(i)     <u>Fuselage, Windows, and Doors</u>:  The fuselage shall be free of major dents and abrasions which are out of Manual limits, scab patches which are temporary or do not comply with Manual limits, and loose or pulled rivets (normal wear and tear excepted); windows shall be free of contamination, blemishes, distortion, delaminations and crazing and shall be properly sealed (normal wear and tear excepted); and doors shall be free-moving, correctly rigged, and fitted with serviceable seals; and all placards, decals or marking shall be installed and legible.

(ii)     <u>Wings and Empennage</u>:  All leading edges shall be free from damage out of Manual limits; all control surfaces shall be properly balanced (with substantiating records) and polished, to the same standard as on Operator's other aircraft; unpainted cowlings and fairings shall be polished to the same standard as on Operator's other aircraft; all wing internal fuel tanks, and fuel

plumbing shall be free of fuel leaks, and all external placards and markings shall be installed and legible.

(iii)   Interior:  Carpets, galleys, lavatories, ceiling, side walls, overhead, passenger service units, bag racks and bulkhead panels shall be secure, clean and substantially free of cracks and stains; all signs, placards and decals shall be installed and clean and legible; and all calendar-lifed emergency equipment shall be returned in compliance with the Maintenance Program. All seat covers and cushions shall be in good condition, clean, free of stains and tears and shall conform to FAA fire resistance regulations; and all seats shall be fully serviceable and in good condition meeting crashworthiness regulations.

(iv)   Cockpit:  All FAA required placards, decals and markings shall be installed, clean, secure, and legible.  All fairing panels shall be substantially free of stains and cracks, and shall be clean, secure, and repainted as necessary; all floor coverings shall be clean and effectively sealed and secured; all seat covers and cushions shall be in good condition and clean and shall conform to FAA fire resistance regulations; and all seats shall be fully serviceable and in good condition.  All instruments and light panels shall be clean, secure and legible, function in accordance with their intended purpose and have all lighting operate properly.

(v)   Cargo Compartments.  All FAA required placards, decals and markings shall be installed, clean, secure, and legible.  All panels shall be in good condition; all nets shall be in good condition; all compartments shall meet current FAA fire regulations; all doors shall be rigged and function properly; and the compartments shall be clean.

(vi)   Landing Gear and Wheel Wells:  All FAA required placards, decals and markings shall be installed, clean, secure, and legible.  The Landing Gear and all wheel wells shall be clean, free of leaks, and repaired as necessary; and all placards, decals and markings shall be clean, secure, and legible.

(k)   Fluid Quantities.  The Aircraft will be returned with the same fluid quantities, including without limitation, fuel, oil and hydraulics, as was initially delivered with the Aircraft on the Delivery Date.  Each fluid reservoir, including oil, hydraulic, water and waste tanks will be serviced in accordance with the Maintenance Program.